**In re M. Ibrahim KHAN, P.S.C., M. Ibrahim Khan, Debtor.**

**Bankruptcy Nos. 48200462, 48200463.**

United States Bankruptcy Court, W.D. Kentucky.

Nov. 10, 1983.

Phillip G. Abshier, Owensboro, Ky., for debtor.

Michael A. Fiorella, Owensboro, Ky., and Rudy C. Bryant, Henderson, Ky., for creditor.

Dolly Yusufji, to all counsel of record, and to all scheduled creditors.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

Hippocrates, the father of medicine in western civilization, in contemplating the duties owed by a physician to his brethren, wrote these lasting lines:

> I will keep this oath and its stipulation—to reckon him who taught me this art equally dear to me as my parents, to share my substance with him, and to relieve his necessities if required; to look upon his offspring as my own brothers ... I will abstain from every voluntary act of mischief and corruption.[1]

Dr. Ibrahim Khan caused a fellow physician to be rendered quadriplegic in an automobile accident in 1978. In order to avoid the inevitable major lawsuit, Dr. Khan signed a contract for the lifetime support of Dr. Dolly Yusufji. When he failed to begin payments, she sued him and obtained a judgment for $1,205,400. When she attempted to enforce the judgment, Dr. Khan promptly filed a Chapter 11 petition with this Court. At this writing, five years after the accident, Dr. Khan has yet to pay Dr. Yusufji the first dollar. She moves about

---

1. The Hippocratic Oath is "still the accepted standard for the ethical physician today." Ta-

ber's Cyclopedic Medical Dictionary (14th Ed. 1981), at p. 662.

in a motorized wheelchair. He drives a Rolls-Royce.

Obviously it is not the Hippocratic Oath with which this Court is concerned. It is, rather, the question of whether Dr. Khan acted in good faith in filing his Chapter 11 petition and that of his wholly-owned incorporated medical practice. To state the facts is to foretell the result.

There are, to be sure, other important facts in the case. But before turning to them we will indulge in a brief summary of the law of good faith as it has evolved in cases under the Bankruptcy Code.

\* \* \* \* \* \*

Because the protections accorded debtors in reorganization proceedings are so absolute and the restraints on claimants so strict, it is required that a reorganization filing be accomplished in good faith. The requirement existed under prior law and was carried forward in the new Bankruptcy Code.[2]

In general terms, the concept of good faith is a jurisdictional requirement of equitable origin. It is the statutory descendant of the venerable "clean hands" doctrine in equity, designed to protect the integrity of the bankruptcy court system and to properly limit access to the extraordinary forms of relief there available. The cases dealing with good faith share the common purpose of preventing abuse of the bankruptcy process.[3]

Much of the case law on good faith draws heavily upon the time-honored method of analyzing and establishing a nexus between cause and effect. Long a *modus habilis* not only in bankruptcy but in criminal and tort law and in virtually any legal inquiry where intent is an issue, this sort of *a posteriori* inquiry permits courts to work backward from effect to cause—to reason, that is, that if the probable effect of a reorganization plan is to treat unfairly of creditors, then the probable cause of the filing was bad faith. The judicial exercise of discovering antecedent intent through a study of subsequent conduct is not unknown to this Court.[4]

Chapters 11 and 13 both have good faith requirements, although the great bulk of the case law that has developed—and it has been substantial[5]—has been under Chapter 13. The reason is that Chapter 13 is available only to individuals, whereas Chapter 11 has been principally used by corporations, and the individual *animus* is always easier to identify, isolate and explore than the corporate.

A preliminary point which we have considered is whether the same standards of good faith apply to both chapters. If so, then we are able to draw upon the broader pool of learning which has accumulated in Chapter 13.

The similarities between Chapters 11 and 13 are many. Both provide for payments to be made in the future and allow liquidation-based plans; both have a "best interests of creditors" test,[6] require a judicial finding of feasibility,[7] and allow confirmation of a plan over creditor objection.[8] Each makes provision for the acceptance or rejection of executory contracts.[9] Finally, both chapters contain good faith requirements.[10]

---

2. A history of the statutory development of the good faith requirement since 1898 appears in *In re Victory Construction Co.,* 9 B.R. 549 (Bkrtcy. C.D.Cal.1981).

3. Ordin, "The Good Faith Principle in the Bankruptcy Code: A Case Study," 38 *The Business Lawyer* 1795 (1983).

4. *In re Cooney,* 18 B.R. 1011 (Bkrtcy.W.D.Ky. 1982), applying the doctrine of implied malice.

5. An appendix to *In re Heard,* 6 B.R. 876, 885 (Bkrtcy.W.D.Ky.1980), lists 49 published good faith cases in 1980 alone.

6. 11 U.S.C. §§ 1129(a)(7) and 1325(a)(4).

7. 11 U.S.C. §§ 1129(a)(11) and 1325(a)(6).

8. 11 U.S.C. § 1129(b), the so-called "cramdown" provision, has no literal counterpart but is implicit in Chapter 13.

9. 11 U.S.C. §§ 365 and 1322(b)(7).

10. 11 U.S.C. §§ 1129(a)(3) and 1325(a)(3).

In contrast to these generic likenesses, the differences between the chapters are largely matters of scale and degree. Chapter 13 generally is tailored to fit the producer of regular income with limited liabilities. In Chapter 11 a petitioner need not produce regular income and can report unlimited liabilities.

The regular income requirement of Chapter 13 is designed to make the chapter available to a broad economic class capable of being treated uniformly by the Chapter 13 Trustee. Chapter 11, on the other hand, was made flexible enough to accommodate variegated business forms having an infinite number of variables of ownership, capital structure and cash flow.

Had Dr. Khan's total liabilities been less than $100,000 and $350,000 on unsecured and secured debts respectively instead of the larger amounts which appear in his petition, he would have been required to file under Chapter 13, thus subject to its good faith requirement. His filing under Chapter 11 should work no basic change in the standards of conduct to which he is held. Nowhere is it written that the basic concept of good faith is altered in any way by one's quantum of debt alone.

■■■ In summary on our threshold point, we have no difficulty in holding that those standards of good faith which control in Chapter 13 may also be applied to an individual filing under Chapter 11. Nor, in the context of this case, do we strain to hold that those same standards may properly be applied to an individual's wholly-owned professional service corporation. The unity of corporate control, the mutuality of interest, and the indivisibility of corporate policy and direction from those of the sole stockholder, render the corporation's motives literally indistinguishable from those of its owner. We are therefore relieved of the often delicate task of "piercing the corporate veil" in the search for personal culpability.

Having concluded that the law of good faith as understood within the context of Chapter 13 also applies here, we are able to turn for direction to the Sixth Circuit's recent pronouncement on the subject in *Memphis Bank & Trust v. Whitman.*[11] We need look no further.

Although primarily a decision on the treatment of secured claims in Chapter 13, *Memphis Bank & Trust* also treated specifically, if not to say forcefully, of the good faith issue. The case embraces the most strict view of good faith, and squarely places the Sixth Circuit at the forefront of the ranks of "substantial repayment" jurisdictions. Although *Memphis Bank & Trust* takes no cognizance of this district's earlier treatment of the issue in *In re Heard,*[12] the two cases doctrinally mirror each other;

> "One way to refuse to sanction the use of the bankruptcy court to carry out a basically dishonest scheme under Chapter 13 is to deny confirmation of the proposed plan. When the debtor's conduct is dishonest, the plan simply should not be confirmed... Another way to deal with the problem when the conduct is questionable but is not found to be dishonest ... is to require full payment in accordance with the contract."[13]

> "The greater the percentage of debt proposed to be paid, the stronger the presumption of good faith; the lesser the percentage, the more intense must be the inquiry of the Court into the issue of good faith."[14]

*Memphis Bank & Trust* also encourages a review of a debtor's prepetition actions, not the fact of his filing alone: "The view that the Bankruptcy Court should not consider the debtor's pre-plan conduct in incurring the debt appears to give too narrow an interpretation to the good faith requirement."[15]

It is impossible to misread Judge Merritt's intent in *Memphis Bank & Trust,* al-

---

**11.** 692 F.2d 427 (6th Cir.1982).

**12.** Supra note 5.

**13.** Supra note 11, 692 F.2d at 432.

**14.** *Heard,* supra, 6 B.R. at 879.

**15.** Supra note 11, 692 F.2d at 432.

though certain of its language could create a jurisprudential thicket from which even the most literate judge may not emerge unscarred. We are relieved, for example, not to be required in this case to mark the boundary between "dishonest scheme" and "questionable conduct," particularly when called upon to fashion a judicial remedy for the latter, for "questionable conduct" by definition may be found in every lawsuit. The facts of this dispute, as the following precis should reveal, pose no such close case.

\* \* \* \* \* \*

The auto accident which resulted in severe spinal injuries to Dr. Yusufji occurred on September 26, 1978. Dr. Yusufji and her husband were passengers in the car driven by Khan. Neither Khan nor Mr. Yusufji, who appeared in court at the good faith hearing, have any visible physical impairment. Dr. Yusufji is a most attractive young woman, but her limbs are now atrophied and misshapen.

Less than two weeks before the statute of limitations would have expired,[16] Khan and the Yusufjis signed an agreement under which the Yusufjis waived their right to sue and Khan agreed to pay Dr. Yusufji $3,500 per month for life. Mr. Yusufji signed for his wife, acting under power of attorney.

The agreement further provided that in the event of default Khan was to become liable for the entire unpaid amount, to be computed "by taking the actuarily computed life expectancy of Dolly K. Yusufji"[17] at the time of default. Her condition and life expectancy on the contract date are not known.

Other features of the agreement provided that (1) Khan would not attempt to discharge the contract obligation in bankruptcy,[18] (2) insurance proceeds of $100,000 would be first applied to Yusufji's monthly payments before Khan's obligation to make payments began, and (3) Khan's wholly-owned professional service corporation, the legal medium for his medical practice, would stand as guarantor to his personal promise to pay.

When insurance funding of the agreement lapsed and the time came for Khan to pay, he did not.

Yusufji sued Khan for breach of contract. The Henderson Circuit Court directed a verdict in her favor and referred the question of damages to a jury. The jury awarded $1,205,400 against Khan and his corporate medical practice, jointly and severally.

After the contract had been signed, but before the Yusufji lawsuit was brought, the Community United Methodist Hospital of Owensboro revoked Khan's privileges to practice there as an orthopedic surgeon. Khan sued for reinstatement. He lost. We will return to that point.

Yusufji obtained execution on her judgment on October 29, 1982. On November 12, Khan took two actions: he appealed the Henderson Circuit Court judgment, and he filed Chapter 11 reorganization petitions with this Court for himself and his corporation.

Khan's first formal motion after filing the petition was a request to be permitted to continue making monthly payments of $1,104 on his 1980 Rolls Royce. Thereafter in rapid order Khan moved for (1) an extension of time within which to complete the schedules accompanying the petition; (2) an extension of time within which the debtor enjoys the exclusive right to file a plan, (3) a motion to consolidate the individual and corporate petitions, and (4) upon denial of the last motion, a request that it be reduced to writing in appealable form. By the time this last pleading was filed, the Court began to dimly perceive the possibility of dilatory

---

**16.** Kentucky has a one-year statute for personal injury actions, KRS 413.140.

**17.** Agreement between the parties dated September 13, 1979, at p. 3.

**18.** It is not clear whether the parties were represented by counsel in the execution of the agreement; if they were, of course, they were both chargeable with constructive notice of the unenforceability of such a contract clause; *see* 11 U.S.C. § 524.

tactics, and it was rejected, on this and other grounds.[19]

The first meeting of creditors was held on January 6, 1983. As it there occurred the following relevant colloquy:

OPENING REMARKS (Gary Abshier): My name is Gary Abshier and I represent Dr. Khan. Dr. Khan lives in Henderson, Kentucky and is an orthopedic surgeon over there. We have filed this Chapter 11. The basic reason it was filed is that there is a personal judgment against Dr. Khan and also his P.S.C. for roughly $1,200,000 arising out of a personal injury case. There is a dispute over that judgment and it's being appealed to the Court of Appeals. Very simply this Chapter 11 was filed because if it were not filed the people that have that judgment would be able to execute on Dr. Khan's assets which a number of you have a security in.[20]

QUESTION (Mr. Fiorella): Except for the judgment that Mr. Abshier has referred to, Dr. Khan, have you been able to pay your debts as they come due generally over the last two years?

ANSWER (Dr. Khan): Yes.

In due course the Khan reorganization plans were filed. They provided for full payment to all creditors except Yusufji and one other, much smaller claim.[21] Considering our disposition of this case on good faith grounds it is not necessary for us to decide the related, and apparently equally serious, question of discriminatory treatment of creditors.[22]

In the first plans filed, Yusufji was to have been paid 20 per cent of the judgment amount, a proposal which in itself would have raised the "substantial repayment" question of In re Heard and precipitated a Memphis Bank inquiry into the debtor's motives.

The plans were subsequently amended to provide that Yusufji would be paid either (a) the amount of her judgment, or (b) the amount she would receive if Khan were to liquidate plus $5,000, whichever is the lesser. In realistic words the proposal was simply to pay her the latter, lesser, amount.[23]

A review of the file, and a reference to our earlier determination of certain real estate values made in connection with a related adversary proceeding,[24] suggests that of the amount which would be made available in a straight Chapter 7 liquidation, Yusufji's aliquot portion would be approximately $125,000, or about 14 per cent of her judgment debt—even less than originally proposed.[25]

19. In re Khan, 31 B.R. 313 (Bkrtcy.W.D.Ky. 1983).

20. All too rarely, perhaps, does this Court openly compliment counsel on their performance. It is due Mr. Abshier in this case not only for his candor and veracity, but for his unswerving loyalty and intense efforts for a client whose cause was less than sympathetic.

21. Khan proposes to discharge without paying his debt as a guarantor on a $60,000 note to the Galatia Bank.

22. Khan has unfairly treated the Yusufji claim by classifying it differently from another obligation of like kind which he proposes to pay in full. Khan owes $8,437 to attorney Frank Haddad for representation in connection with the accident, which Khan does not propose to pay until it, like the Yusufji claim, is reduced to final nonappealable judgment. Khan proposes to pay that amount in full, and therefore incorrectly places the Haddad claim in a separate classification.

23. Correctly predicting that Yusufji would vote against the plan, Khan amended it to make a technical adjustment to qualify for the so-called "cram-down" hearing. The cram-down, or coerced confirmation, is only available if the "best interest of creditors" test is met. Part of that test is that creditors receive "not less than the amount such holder would so receive ... if the debts were liquidated." 11 U.S.C. § 1129(a)(7)(A)(ii).

24. First National Bk. of Henderson v. Khan, AP483–0041, Order of August 18, 1983.

25. Our computations are based on evidence of record and information from the petition itself: real estate equities of $60,000, accounts receivable totaling $40,000, and cash on hand of $25,000. We have assumed without deciding the propriety of certain claimed exemptions, including the $166,000 in the pension fund, note 26 infra, the Rolls and Mercedes-Benz (claimed exempt as a tool of the trade), and such necessary household furnishings as four color television sets.

It is not enough. It is less by far than the amount Khan has set aside for his declining years and claimed exempt in this proceeding.[26] It is significantly less than Khan's annual net earnings for three of the preceding five years.[27]

█ Good faith in Chapter 11 presupposes some element of self-sacrifice by the debtor commensurate with that demanded of the creditors. We see none here. We see instead the maintenance of a comfortable life style and the satisfaction of all creditors save one,[28] who is being asked, as it were, to independently finance the entire cost of Khan's "rehabilitation" at the expense of her own.

Khan points out that his earnings have declined over the last two years, a fact attributable to his loss of operating privileges at the Henderson hospital.

The facts of the hospital-privilege case are not before us. We know only that upon revocation of the privilege Khan sued in federal court for reinstatement, lost, took an appeal, and lost the appeal in the Sixth Circuit on jurisdictional grounds; that he is free to, and now does, practice in other hospitals. We know also that an orthopedic surgeon depends in large measure for his livelihood on referrals and the good will of other physicians, including those who comprise hospital boards; that in a small town such as Henderson the Khan-Yusufji difficulty likely resulted in a loss of good will, and that he will no longer be able to perform surgery there. In these post-accident developments there is a hint of causal connection; it is not inconceivable that Khan's conduct toward Yusufji may have contributed to his privilege revocation.

But all of the above is pure speculation, and does not form the basis of our opinion, as we will explain.

Khan argues that (a) resort was had to Chapter 11 to permit a restructuring of his affairs pending, hopefully, an appellate restoration of his hospital privileges, (b) that such use of Chapter 11 for interim protection is justified by case law, and (c) that therefore the petitions were filed in good faith. The argument is not without some legal basis, but it is without relevance.

It is true that some bankruptcy courts have held that a Chapter 11 filing may, in good faith, be utilized as the functional equivalent of an appeal bond.[29] We do not agree with those opinions but do not find it necessary here to commence an argument with them.[30]

We may assume, therefore, that Khan's motive in invoking Chapter 11 to lessen the impact of the hospital-privilege dispute was pristine pure.

But an organism as commodious as the human mind is fully capable of housing many conflicting motives concurrently, some good, some bad. The latter not only taint the former, but if they are found to predominate, and to form the fundament of a Chapter 11 petition, that petition must be dismissed.

It is not the hospital-privilege dispute that brings about our dismissal today. It is the treatment of the Yusufji claim.

Since the accident Khan has fought off Yusufji's legal demands with the classic siege strategy of starving the opponent into submission through sheer economic staying power alone. Absent abuse of process there

---

**26.** The question of whether, or how much of, the claimed $166,000 exemption should be allowed, has been briefed and submitted to the Court. Our opinion today renders that controversy moot.

**27.** Khan's net earnings were $170,020 in 1970, $202,199 in 1980, and $148,758 in 1981.

**28.** It is assumed that the Galatia Bank, which Khan seeks to discharge without paying, will still be able to turn to the original maker on the $60,000 note.

**29.** Cited by the petitioners are the cases of *In re Alton Telegraph Printing Co.,* 14 B.R. 238 (Bkrtcy.S.D.Ill.1981) and *In re McLaury,* 25 B.R. 30 (Bkrtcy.N.D.Tex.1982).

**30.** Other than to say, which we must, that to equate Chapter 11 with a supersedeas bond is to invite every business entity in the country with a current judgment against it into the bankruptcy courts.

is nothing wrong with this survival technique. But here there is abuse of process of a particularly reprehensible sort.

■ Reconstructing Khan's intentions by recounting his attainments, in inverse chronological order, we find that he has (a) evaded enforcement of the Yusufji judgment for one year during the formulation of Chapter 11 plans which would reduce its amount by an inordinate 86 per cent, (b) evaded payment of the contract for support from the outset by simply not paying, and (c) evaded what would have been a legitimate personal injury action by entering into the contract initially, thereby committing a fraud at the outset.

See also Bkrtcy., 12 B.R. 465.

Khan, we can only conclude, never intended to pay Yusufji. He conscripted the legal system in furtherance of that intention and vulgarized it in the process. This case reveals bad faith in its ugliest form, the willful and malicious evasion of a high legal duty by turning the legal system against its own ends, executed with naked arrogance.

Stopping short of some of the more dramatic judicial sanctions that have been invoked in bad-faith cases,[31] we simply order that these Chapter 11 petitions shall now stand dismissed.

---

**31.** In *Meyerson v. Werner,* 683 F.2d 723 (2d Cir.1982), the debtor was directed to voluntarily withdraw his petition and was ordered taken into custody by the United States Marshal and confined until he did so. The Second Circuit affirmed.