### In the Matter of GOLDEN OCALA PARTNERSHIP, Debtor.

#### No. 85–410.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 13, 1985.

Harley Riedel, Tampa, Fla., for debtor, John K. Olson of counsel.

Edward Waller, Tampa, Fla., Futch, Reagin, Ness, David, Miller & Beckner.

## ORDER OF DISMISSAL

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 case and the matter under consideration is a sequel to a hard-fought tug-of-war ostensibly between

Golden Ocala Partnership (Golden), the Debtor involved in this Chapter 11 case and James E. Reagin, Robert Futch, David David, James A. Hess, Harry J. Beckner, and Bruce Miller, collectively referred to as the "Reagin Group." The immediate matters under consideration are a "Motion to Discharge Lis Pendens" and a Motion to Dismiss the above-captioned Chapter 11 case, both filed by the Reagin Group. In order to put this seemingly complex, but in the long analysis basically simple, controversy in prospective, a review of the historical background of the controversy together with the relevant facts is not only helpful, but indispensable indeed.

Golden Ocala, Inc. (Golden, Inc.) is a Florida corporation formed in 1983. It obtained a corporate charter from the Secretary of State of Florida on May 12, 1983 (Exh. No. 1). Golden, Inc. was founded by Robert Futch and Philip Ritson and the brother of Mr. Futch, a practicing attorney who prepared the necessary documents to form the corporation. It appears that the corporation was formed for the purposes of acquiring and developing a large tract of land located in Ocala, Marion County, Florida. Mr. Ritson, who was deeply involved in the sport of golf, had the idea of building, and then operating, a first class golf course facility on the property. At the time the property was owned by Mr. and Mrs. Castro and Castro Realty Corp. (Castro Interest). It appears that one Hal H. Curry (Curry) acquired an option to purchase the subject land from the Castro Interest and Curry assigned his option to Mr. Futch. It is without dispute that Golden had no assets at this time of any kind, did not conduct any business in·any conventional sense and was formed for one purpose, and one purpose only, to wit: to use the option held by Mr. Futch as the vehicle to obtain the necessary financing and ultimately to develop the land as a first class golf course complex under the guidance and management of Mr. Ritson. At this point, it is clear that all Golden had was a vision and hope based on the option held by Mr. Futch.

This was the situation when Mr. F. Sheridan appeared on the scene whose appearance and ultimate involvement with the project became the focal point and the very basis of all controversies between the parties. Mr. Sheridan was, and still is, a prominent personality in golfing circles having been associated with a very famous, if not the most famous golfing facility in Europe, the All Saints Golf Course located in St. Andrews, Scotland. Mr. Sheridan is the Chairman of the Board of that facility and without a doubt a first class expert and well recognized as such by all connected with the sport of golf.

In 1983, Mr. Sheridan was introduced to Mr. Ritson who explained to him his idea concerning the development of the land on which Mr. Futch held the option. Mr. Sheridan having inspected the land, expressed a great interest in the project and agreed immediately to become involved not only in a perfunctory fashion, but also as a principal participant in the project and the principal who was to secure the necessary financing to launch the project. In order to put the project on track, it was agreed that Mr. Sheridan will be granted 20% interest in Golden, Inc., a percentage which while did not represent an absolute majority of stock ownership, it did represent the largest simple stock ownership next to 10% held by Ritson and 10% held by Futch. The balance of the outstanding stock was distributed among five other persons, none of whom held more than 3% of the total outstanding shares.

It is without dispute that it was intended that Ritson was to be the executive in charge of the day-to-day operation of the facility with the title of Executive Vice President. Sheridan, who was to procure the necessary financing, did indeed accomplish this goal and within 28 days secured the participation in the project of a large British corporation known as European Ferries PLC. European Ferries agreed to procure the necessary financing in exchange for its participation in the project. In order to accomplish this, European Ferries created a Texas corporation known as EF International, Inc. (EFI) f/k/a Hyde

Investment, which in turn became a parent of a Florida corporation known as E.F.F., Inc. (EFF). This is the entity which was designed to become, and in fact became, the general partner in a partnership known as Golden Ocala Partnership (Golden), the Debtor, in which Golden, Inc. and EFF were to be the two corporate general partners of the Partnership. The option to purchase the subject land held by Futch, was assigned first to Mr. Sheridan who in turn assigned the same to the partnership. The ownership interest in the partnership was allocated between the two general partners as follows: 60% held by Golden, Inc.; 40% by EFI. The corporate structure of Golden, Inc. is one of the matters involved in this controversy, largely because the claim asserted by the Reagin Group as one ground for dismissal of the Chapter 11, that Mr. Sheridan had no authority to act on behalf of the Debtor at all, but most importantly to authorize the institution of this Chapter 11 case. Be that as it may, it is clear that while the initial Board was composed of Mr. Sheridan, acting as Chairman, and Mr. Ritson and Mr. Futch, it is clear that both Mr. Futch and Mr. Ritson resigned as officers and directors of Golden, Inc. on July 11, 1983. There is no doubt that Mr. Sheridan was, in fact, the President of Golden, Inc. at the time the Petition was filed and was the only person with the authority to act on behalf of the Debtor.

It appears that the parent of the other general partner, EFI, indicated that it was no longer interested in the project and told Mr. Sheridan that it wanted to be taken out. Since EFI was the only entity who was instrumental in obtaining the initial financing, a $7 million loan from Bank of Scotland, in addition to $2.5 million of its own funds, it became obvious that Mr. Sheridan was in a dire need to obtain not only a replacement for EFF as a general partner, but also, of course, replacement financing previously procured by EFI. In search of this goal, Mr. Sheridan came in contact with James E. Reagin and discussed the possibility to obtain Reagin's participation in the project. Reagin agreed

and on February 24, 1984, entered into an agreement with Sheridan (Exh. # 4).

According to this agreement, Reagin would procure the funds necessary to take out European Ferries and its subsidiaries, EFI and EFF. This was to be accomplished, for reasons not clearly explained, in the following manner: Golden, Inc. was to acquire all outstanding stock in EFI, a subsidiary of European Ferries, thereby becoming the parent of EFF, the other corporate general partner of Golden. This entity was to be "liquidated" later either through liquidation or merger with Golden, Inc. which, in turn, would be merged into a newly formed corporation to be known as Golden Ocala Limited Partnership, Inc. (Golden Ocala). This was to be the only surviving entity and the ultimate owner and the developer of the project. The interest in this newly formed entity was to be distributed as follows: 51% to be held by the "Reagin Group;" 49% by Sheridan or an entity controlled by Sheridan.

Mr. Reagin did obtain a loan commitment from the First State Bank for $37 million based on an appraisal which valued the land at $57 million. It appears that while the original plan to take out EFI was accomplished and the original loan made by the Bank of Scotland in the amount of $7 million was paid off together with an additional repayment of $2.5 million of a short term loan, the ultimate restructuring as planned did not occur. Thus, the conveyance of all rights, title and interest of the Debtor which was to take place on March 23, 1984 was not to the newly formed corporation, i.e. Golden Ocala, but to the six individuals composing the "Reagin Group." While Golden Ocala was in fact formed, it is without dispute that shares were never issued to Sheridan or to anyone else who was supposed to be a stockholder in the newly formed corporation.

It appears that the consideration for the conveyance by the Golden to the six individuals was $9.5 million mentioned earlier plus an assumption by Golden Ocala of all the outstanding liabilities and a payment of all debts of the Debtor, including disputed

debts to the extent their validity is ultimately established.

It further appears that the Reagin Group embarked on a program of marketing some of the subject land and they now hold approximately 70 land contracts totalling more than $11 million. Out of these, contracts totalling $2.5 million are ready for immediate closing; an additional $2 million could be closed shortly; and the balance could also be closed in the near future.

These are basically the salient facts which ordinarily would present nothing more than an intercorporate and an inhouse dispute between competing ownership interests and would not be of any concern to this Court. However, as it happens with more and more frequency, this is not the case because the notion is rapidly developing that this Court was designed by Congress to serve as a haven to all comers regardless of the nature of their troubles or difficulties. This notion is no doubt founded on an evergrowing awareness of the protective umbrella of the automatic stay imposed by § 362 of the Bankruptcy Code which is triggered by the institution of a case under any of the operating Chapters of the Bankruptcy Code. Thus, it is not really surprising that Sheridan, having realized that he no longer had control of the fate of this project and was no longer in a position to create a golf course equal, if not superior, to a golf course at St. Andrews, saw no other solution to his problem but to resort to this Court and to file a Petition for Relief under Chapter 11 of the Bankruptcy Code.

This is indeed what followed and on February 21, 1985, Sheridan filed a Voluntary Petition under Chapter 11 on behalf of Golden. At the same time, Golden also filed an adversary proceeding alleging a fraudulent transfer of the subject land to the Reagin Group and in order to prevent any sales, filed a Lis Pendens in the Public Records of Marion County. As a consequence, the individuals named in the adversary proceeding as defendants in the fraudulent transfer actions were faced with the possibility to lose all prospective sales. In order to prevent this unforseen turn of events, they immediately launched a counterattack and filed a Motion to Dismiss the entire Chapter 11 case and a Motion to Discharge Lis Pendens.

The Motion to Dismiss the Chapter 11 case is based on the contention of the Reagin Group that (1) the Petition for Relief was not an authorized act of Golden; (2) that it was filed in bad faith because Golden has no creditors and the sole purpose was to frustrate the prospective sales by the Reagin Group, and in any event, Golden has no intention to propose a plan of reorganization. The Schedule of Liabilities submitted by Golden with the Petition listed as creditors the following: Hal J. Curry, contingent in excess of $1,000,000.00 and Ronald M. Garl in the amount of $92,500.00. In addition, there are other creditors listed including a claim by Mr. Sheridan and by the St. Andrews golf course and by a law firm in England, although there is no evidence that the law firm ever rendered any services to Golden.

Golden admittedly has no assets whatsoever except a possible claim against the six individuals who acquired all rights, title and interest in the subject land by virtue of the warranty deed executed by Golden on March 24, 1984. As noted, in order to enforce this claim, Golden filed a complaint attacking this transaction as fraudulent based not only on § 548 of the Bankruptcy Code, but also § 726 of Fla.Stat., the Statute dealing with fraudulent conveyances.

Inasmuch as the right of Golden to maintain a viable Chapter 11 case presents a threshold question, this Court initially scheduled an evidentiary hearing to consider the issues raised by the Motion to Dismiss the Chapter 11 case. At the conclusion of the evidentiary hearing, this Court announced that the evidence presented in support of the Motion fell short of the degree of proof which would have warranted the finding that the Petition was filed in "bad faith" and thus represented a "cause" for dismissal under § 1112(b)(1) of the Bankruptcy Code. This conclusion was based on the announced finding that Mr.

Sheridan was in fact the President and Chairman and the sole surviving member of the Board of Directors of Golden; that he had the authority to file the Petition for Relief on behalf of Golden as the chief executive officer of both general partners; that there was no evidence that Golden had no intention to file a plan of reorganization; that the timing of the filing was without legal significance and Golden has at least two creditors holding two significant claims, one by Mr. Curry in excess of $1 million and the other by Mr. Garl in the amount of $92,500, the architect hired by the Debtor to design the golf course.

In light of the foregoing, this Court directed that a hearing on the Motion to Discharge Lis Pendens shall be rescheduled in order to receive evidence in support of and in opposition of the Motion. At the rescheduled hearing, the Court heard testimony of witnesses, received documentary evidence and based on the original record and the evidence received at the rescheduled hearing now finds and concludes as follows:

It should be noted at the outset that this is not so much an attempt to effectuate a reorganization by a financially distressed debtor, as it is an attempt to have this Court furnish a forum to the Debtor to resolve an in-house battle centering around the ownership and control in a non-debtor corporation which Sheridan voluntarily gave up.

██ Contrary to its claim of a fraudulent transfer initially recognized by this Court, Golden no longer has any such claim. The record is clear and uncontradicted that Golden Ocala is willing to issue the stocks pursuant to the original agreement between Mr. Reagin and Mr. Sheridan, including stocks to Mr. Sheridan; that it is willing to pay within two weeks all undisputed claims against Golden and is willing to place in escrow all funds necessary to pay all disputed claims and to pay them to the extent they are ultimately found to be valid. This being the case, it is evident that there are no affairs of Golden which are in need of reorganization and the

only possible justification to maintain this Chapter 11 case would be to assist Mr. Sheridan to prevent the Reagin Group to implement its marketing plan which according to Mr. Sheridan would destroy his hope to develop a first class golfing facility. While his disapproval of the marketing plans of the Reagin Group is clearly understandable, and this Court is sympathetic to his plight, this does not change the inescapable fact that Chapter 11 was not designed to police internal management of non-debtor corporations or to resolve internal fights between feuding stockholders. Neither was this Court charged with the duty to pass on the wisdom or lack of wisdom of corporate policies or the economic soundness of decisions of management who are properly in charge of the affairs of a corporation unless there are interests other than ownership interests which are affected by decisions of the management.

██ As noted, Golden conducts no business of any sort. It has no employees, it does not sell or buy anything or render any service to anyone. It has no assets of any kind except its claim, validity of which is questionable, of a fraudulent transfer of the land once owned by Golden and now owned by the Reagin Group. The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. *See, In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 922 (Bankr.N.D.Ill.1982). "[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre* ...." *In re Ironsides, Inc.*, 34 B.R. 337, 339 (Bankr.W.D.Ky.1983). More generally, an implicit prerequisite to the right to file is "good faith" on the part of the debtor, the absence of which may constitute cause for dismissal under § 1112(b). *See, Dolton Lodge*, 22 B.R. at 922. Factors relevant in examining whether a Chapter 11 petition has been filed in good faith include whether the debtor had any assets, whether the debtor had an ongoing business to reorganize, and whether there was a reasonable

probability of a plan being proposed and confirmed. *Id.,* at 923; *see, In re Eden Associates,* 13 B.R. 578, 585 (Bankr.S.D.N.Y.1981) ("The Debtor, with no assets, no bona fide creditors and no business, cannot effectively rehabilitate its enterprise ..."); *see also, In re Tinkoff,* 141 F.2d 731 (7th Cir.1944). Faced almost with the identical problem, the Bankruptcy Court for the District of New Jersey in the matter of *Century City, Inc.,* 8 B.R. 25 (1980) held that when a debtor's motive is not to rehabilitate a financially distressed debtor, but merely to use the Bankruptcy Court and the procedures available in bankruptcy to recapture parcels of property delivered by an agreement, albeit allegedly fraudulently, it is clearly misuse of the Bankruptcy Code and it would be clearly in the best interest of not only the creditors, if any, but clearly the debtor to pursue the recapture of the property in an appropriate non-bankruptcy forum. This is especially true in cases where the debtor has no bona fide creditors, the presence of which is clearly an indispensable factor to a bona fide attempt to achieve rehabilitation consistent with the Congressional policy of Chapter 11 of the Bankruptcy Code. If there is nothing in the record to establish that the major objective of the reorganization provision is to use a viable mechanism for the rehabilitation of the financially troubled business, the petition for relief under this Chapter has not been filed in good faith.

█ While it is true that at the time the original petition was filed on behalf of Golden, Golden had at least two creditors holding substantial debts and their willingness to accept satisfaction only surfaced after the commencement of the case, this Court is still satisfied that upon reconsideration, it is proper to grant the Motion to Dismiss the Chapter 11 case. From this it follows that the adversary proceeding filed by the Debtor against the Reagin Group must also be dismissed, simply because the maintenance of this suit is indispensable to the viability of this Chapter 11 case.

█ One last comment. Bankruptcy Rule 2002 provides that no voluntary or involuntary case should be dismissed except with 20 days notice to all parties of interest. Admittedly, in this case, no twenty day notice was given of the hearing on the Motion to Dismiss filed by the Reagin Group. It is the considered opinion of this Court that a Motion to Dismiss a Chapter 11 case pursuant to § 1112(b) including for lack of good faith raises an issue only between the moving party and the Debtor, therefore, it is not necessary to give any notice of hearing on the Motion to Dismiss to the general body of creditors, albeit, they are entitled to be notified, of course, if the Motion is granted and the case is dismissed.

This being the case, it is clear that the dismissal of the adversary proceeding also compels the discharge of the lis pendens which cannot, of course, exist in the vacuum and without a viable active lawsuit. Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the Motion to Dismiss filed by the Reagin Group be, and the same hereby is, granted. It is further

ORDERED, ADJUDGED AND DE-CREED that the above-styled Chapter 11 case be, and the same hereby is, dismissed. It is further

ORDERED, ADJUDGED AND DE-CREED that the official Creditors' Committee heretofore appointed be, and the same hereby is, discharged and relieved of any further duties. It is further

ORDERED, ADJUDGED AND DE-CREED that the Clerk of the Bankruptcy Court is hereby directed to give notice of the entry of this Order to all creditors forthwith.