In re William C. MOOG, Jr., Debtor.

Bankruptcy No. 92–32825–BKC–RAM.

United States Bankruptcy Court,
S.D. Florida.

Oct. 1, 1993.

Jose I. Astigarraga, Steel, Hector & Davis, Miami, FL, for Jane Moog.

David C. Profilet, Profilet & Venzer, P.A., Miami, FL, for debtor.

## MEMORANDUM OPINION

ROBERT A. MARK, Bankruptcy Judge.

In this case, the Court must decide whether a solvent, wealthy individual may use Chapter 11 to renegotiate the terms of a divorce settlement he no longer favors. Under the facts presented, the answer is no.

On November 21, 1992, Jane Moog, a creditor and former wife of the Debtor, filed a Motion to Dismiss this Chapter 11 Case or in the Alternative for Abstention. Mrs. Moog died during the pendency of this motion which is now being prosecuted by her estate. As a result, in part, of ongoing settlement discussions between Mrs. Moog and the Debtor, a full evidentiary hearing on the motion to dismiss was deferred for several months. The evidentiary hearing was conducted over the course of four days starting on June 24, 1993, continuing on July 22, 1993, and concluding on September 9th and September 11, 1993.

Having considered the motion, the memoranda filed by the parties, the evidence presented at the hearing, the testimony of the witnesses and the arguments of counsel, the Court is granting Mrs. Moog's motion and dismissing the case. Simply stated, this Chapter 11 petition was filed in bad faith in an effort to avoid execution on a divorce judgment and to improperly use the bankruptcy court as a forum to renegotiate the divorce.

## FACTUAL BACKGROUND

### A. The Debtor's History

The Debtor, William Moog, has enjoyed a long and successful career as an inventor, innovator and entrepreneur. Moog, Inc., the company he founded to develop and market certain innovative technology he invented was extremely successful and, by 1988, was a publicly traded company with revenues in excess of $300,000,000 a year.

In February, 1988, Mr. Moog exchanged his equity in Moog, Inc., for the company's domestic industrial controls business and its automotive market activities. These two divisions were placed into a new corporation known as Moog Controls, Inc. ("MCI"). Mr. Moog is the 100% owner of MCI and his interest in this company represents the primary asset of the bankruptcy estate.

### B. The New York Divorce

On May 28, 1991, after having earlier received a letter from Mr. Moog suggesting they divorce, Mrs. Moog filed a divorce action in the state of New York. At Mrs. Moog's request, a temporary restraining order was entered against Mr. Moog and MCI prohibiting acts out of the ordinary course of MCI's business.

After and notwithstanding entry of the restraining order, Mr. Moog created a trust for the purpose of holding title to his MCI stock. The clear intent of the trust was to prevent Mrs. Moog from asserting any claim against the stock in the divorce proceeding. The trust was not funded and Mr. Moog retained ownership of the MCI stock. The value of that ownership interest became a central issue in the divorce.

On July 31, 1991, New York Supreme Court Judge Cosgrove entered an order continuing the restraining order. Judge Cosgrove found that Mr. Moog's creation of a trust and his attempt to transfer property to the trustee showed Mr. Moog was seeking to dispose of marital assets to prejudice Mrs. Moog's claim for equitable distribution (Movant's Exhibit 8).

On November 14, 1991, the parties announced a settlement stipulation which was intended to divide up the marital estate equally. Based upon independently obtained financial advice, the parties agreed that as of June 17, 1991, the value of MCI was $25,500,000.00. Mr. Moog agreed to pay Mrs. Moog ½ of that amount in cash, namely $12,750,000.00, as follows:

1. $8,500,000.00 by December 15, 1991;

2. $4,250,000.00 payable at $1,000,-000.00 annually, starting December, 1992, with a final installment of $1,250,000.00. This money was to be held in trust and used, if necessary, to pay ½ of the capital gains tax in the event Mr. Moog sold MCI.

3. Interest on $1,250,000.00 payable monthly commencing on January 1, 1992. Under the settlement, Mr. Moog retained his stock in MCI. The settlement also provided for the remainder of the marital estate to be divided equally.

The settlement clearly contemplated a possible sale of MCI, since the purpose of requiring $4,250,000.00 to be held in trust was to ensure that Mrs. Moog would share in the capital gain taxes that would be due and owing if the company was sold. For example, if the company had been sold for $25,500,000.00, and assuming a 33% capital gains tax obligation, the entire $4,250,-000.00 would have been paid to the Internal Revenue Service representing Mrs. Moog's equal portion of the $8,500,000.00 tax obligation. The intent was to prevent a windfall in which Mrs. Moog would get half of the gross sale proceeds with Mr. Moog required to pay all of the capital gains tax. Thus, although Mr. Moog may have hoped to retain the company, a sale of MCI was a contingency specifically contemplated when the parties entered into the settlement.

### C. *Mr. Moog Defaults—Mrs. Moog Seeks Enforcement*

Mr. Moog failed to pay the $8.5 million obligation when due on December 15, 1991. Moog also failed to pay the $28,000.00 monthly interest payments due beginning January 1, 1992. Mrs. Moog sought relief in the New York court requesting on March 23, 1992, an order to show cause for the appointment of a receiver for MCI based on Mr. Moog's defaults (Exhibit 19).

During this time period, Mr. Moog, through his advisers and attorneys, was actively seeking to borrow enough money directly or through MCI to pay his obligations to Mrs. Moog. Also during this period, the bankruptcy schedules and Moog's deposition testimony establish that he was continuing his lavish lifestyle and bestowing gifts, including cars and money on other women.

The first in a series of significant hearings before Judge Cosgrove was held on April 3, 1992. Mr. Moog's counsel, Mr. Pearson, sought to persuade the court that Mr. Moog was using his best efforts to get financing and that a receiver would cause undue expense to MCI and not be in the best interests of either party. Judge Cosgrove denied the request for a receiver, but ordered other relief including a $500,000 partial payment of the 8.5 million dollar judgment (Exhibit 23). The order also prohibited Moog from transferring or disposing of his MCI stock. Although Mr. Moog agreed in whole or in part to the relief, he was effectively forced to agree to the payments and restrictions in order to obtain additional time to pay the 8.5 million dollar judgment, time which he needed to continue his control over MCI without the cost and interference of a receiver.

By May of 1992, Mr. Moog, at the advice of his lawyers and advisors, purportedly had agreed to sell his stock or to sell MCI, if necessary, to satisfy the judgment. He filed an affidavit reciting his ongoing efforts, including his expectation of signing a retainer letter with an investment banker in order to pursue a sale (Exhibit 25).

At a hearing before Judge Cosgrove on May 18, 1992, Mr. Moog's counsel specifically stated that Mr. Moog had agreed to sell MCI and stated that "clearly Mr. Moog at some point will have to accept the best offer received" (Exhibit 24, Page 9). As a result of these representations, the state court again denied Mrs. Moog's request for appointment of a receiver and set a further hearing for June.

At the June 2, 1992 hearing, Mr. Moog's counsel reconfirmed Mr. Moog's unequivocal commitment to sell the company or its stock in order to satisfy the judgment:

"Mr. Moog has committed himself to the sale, we are committed to that."

(Exhibit 29, Page 38). Persuaded by Mr. Moog's statements and his counsel's statements that Moog was attempting to sell

and that a receiver would be costly, the court again denied the request to appoint a receiver and instead appointed a "monitor" to assist the court in reviewing Mr. Moog's effort to sell the company to satisfy the judgment.

On August 18, 1992, shortly before a further hearing scheduled before Judge Cosgrove, Moog filed his Chapter 11 petition.

### D. Postpetition Conduct and Events

At his § 341 Meeting, Mr. Moog admitted that no other creditors were pressing him for payment of debts when he filed his Chapter 11 petition (Exhibit 34). Instead, Mr. Moog filed his petition solely to prevent or delay the consequences of his failure to pay the divorce judgment and more specifically to frustrate Mrs. Moog's legitimate efforts to collect that judgment. Mr. Moog filed with the intent of not only delaying payment to his wife, but also changing the essential concept of the divorce settlement he had agreed to nine months earlier.

After originally filing a plan that called for a payment of Mrs. Moog's judgment over ten years, Mr. Moog's latest proposed plan provides for her estate to receive 49% of the stock in MCI. Based on the now diminished value of MCI, this minority interest in MCI is worth far less than the divorce judgment. The plan also provides for Mrs. Moog's estate to receive full payment upon Mr. Moog's death or an earlier sale of the entire company. The restrictions on transfer of the stock render it difficult, if not impossible, for her estate to realize any substantial value for that stock interest until the company is sold or Mr. Moog dies. In practical terms, Mr. Moog's plan represents a bad faith effort to retain ownership and control of MCI and to avoid payment of the debt to his wife's estate until the day he dies.

Mr. Moog has not seriously tried to sell the company during this Chapter 11 case. In fact, an October 1992 letter sent to Mr. Moog's advisor by his investment bankers confirms that after filing the petition, Mr. Moog was no longer willing to sell more than a minority interest in the company.

He was suggesting an unrealistic $40,000,-000.00 valuation for the company and seeking a sale which would enable him to retain control (Exhibit 43). This letter demonstrates Mr. Moog's intent to renege on the commitments made to Judge Cosgrove. Once he filed this case, it was no longer his intention to sell the company to satisfy the judgment and he certainly was not acting with the intention, stated by his counsel to Judge Cosgrove, of taking the best offer available. Rather, any good faith efforts he was making prepetition to borrow money or sell the company to satisfy the judgment were replaced by a bad faith effort to avoid the judgment, avoid a sale of the company and change the divorce settlement from a cash deal into a stock deal.

## DISCUSSION

### A. Bad Faith Dismissal

█ Mrs. Moog argues that this Chapter 11 petition should be dismissed as a bad faith filing. 11 U.S.C. § 1112(b) provides authority to dismiss a case for cause. That section of the Code lists nine non-exclusive grounds for dismissal. The list is not exhaustive and courts have concluded that a debtor's "lack of good faith" may also constitute cause for dismissal of a petition under § 1112(b). *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988); *In re Albany Partners*, 749 F.2d 670 (11th Cir.1984).

█ There is no precise test for determining bad faith but courts have identified certain factors which show an "intent to abuse the judicial process and the purposes of the reorganization provisions." *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987). Among the factors include the timing of the petition, *Natural Land*, 825 F.2d at 298; whether the debtor is "financially distressed", *In re Waldron*, 785 F.2d 936, 939 (11th Cir.1986), *cert. dismissed*, *Waldron v. Shell Oil Company*, 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986); whether the petition was filed strictly to circumvent pending litigation, *In re HBA East, Inc.*, 87 B.R. 248 (Bankr.E.D.N.Y. 1988); and whether the petition was filed

simply to get out of a "bad deal", *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir.1989), *cert. denied, Dixie Broadcasting, Inc. v. Radio WBHP, Inc.*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).

A majority of the published decisions involving bad faith allegations are single asset real estate cases in which the petitions are filed near or at the end of the foreclosure process. *See e.g., In re Phoenix Piccadilly*, 849 F.2d 1393 (11th Cir.1988). The Eleventh Circuit addressed the issue of bad faith in a non-real estate litigation dispute in *In re Dixie Broadcasting, Inc.*. In that case, the debtor filed a Chapter 11 petition to avoid a state court judgment compelling specific performance of a contract to sell a radio station. The proposed purchaser sought stay relief or dismissal arguing that the petition was filed in bad faith.

The bankruptcy court lifted the automatic stay, and its decision was affirmed by the district court. The Eleventh Circuit also affirmed citing factors including the timing of the Chapter 11 petition, the attempt to use Chapter 11 to avoid an unprofitable contract, and the improper use of Chapter 11 as a "diversionary tactic" in response to unsuccessful prior state court litigation. *In re Dixie Broadcasting Inc.*, 871 F.2d at 1027–1028.

The bankruptcy court's decision in *In re HBA East, Inc.*, 87 B.R. 248 (Bankr. E.D.N.Y.1988) is also instructive here. In that case the court found bad faith based upon the connection between the bankruptcy case and a lawsuit pending in another court at the time the bankruptcy was filed. In *HBA*, two so-called boxing industry entrepreneurs were engaged in state court litigation arising out of their business relationship. The debtors filed a Chapter 11 petition in the midst of the hotly contested state court litigation.

In dismissing the petition, the *HBA* court stated that as a general rule, if the timing of the filing is such that the court concludes that the primary, if not sole purpose, of the filing was a litigation tactic, the petition may be dismissed as not being

in good faith. *Id.* at 260. Explaining further, the court observed that Chapter 11 petitions filed for the purpose of frustrating the legitimate processes of a non-bankruptcy forum, constitute use of the reorganization vehicle inconsistent with congressional intent. *See also In re Karum Group, Inc.*, 66 B.R. 436 (Bankr. W.D.Wash.1986) (case dismissed where debtor filed as a litigation tactic to avoid posting supersedeas bond); *Matter of Golden Ocala Partnership*, 50 B.R. 552 (Bankr.M.D.Fla.1985) (Chapter 11 not designed to resolve internal fights between feuding shareholders); *Matter of Ofty Corp.*, 44 B.R. 479 (Bankr.D.Del.1984) (case filed to circumvent liquidation orders in state court dismissed as a bad faith filing); *In re Wally Findlay Galleries (N.Y.) Inc.*, 36 B.R. 849 (Bankr.S.D.N.Y.1984) (case dismissed where intent was to relitigate not reorganize).

■ Applying the law to the facts here, the circumstances surrounding the filing of Mr. Moog's bankruptcy case demonstrate that the petition was filed in bad faith. First, the petition was filed as a litigation tactic to circumvent the New York Supreme Court's efforts to enforce the divorce decree. Mr. Moog had unequivocally committed to sell his stock in MCI or sell the entire company, if necessary, to pay the agreed upon judgment to his wife. After defaulting under the state court judgment by failing to pay the $8.5 million due on December 15, 1991, Mr. Moog's strategy in state court was to avoid the appointment of a receiver which would oust him from control of MCI. To accomplish this, Moog and his counsel repeatedly assured the state court judge of Moog's good faith attempts to borrow the money or sell the company to pay the judgment.

Mr. Moog was running out of room in the state court since he was committed on the record to selling the company. Indeed, his counsel had stated "clearly at some particular point in the future Mr. Moog will have to accept the best offer received" (Exhibit 24). That point in the future had arrived by August of 1992 and Mr. Moog was faced with the choice of selling his

company at what he perceived to be an unfavorable price or risking the appointment of a receiver. Moog improperly chose to file a Chapter 11 to avoid either of these unattractive choices.

In addition, Moog's plan reveals that, much like the debtor in *Dixie Broadcasting*, he filed the plan to get out of a bad deal. The state court judgment was agreed to by Mr. Moog who, with the advice of experienced lawyers and financial advisors, agreed to a money judgment reflecting Mrs. Moog's ½ interest in his estate. His stated intent was to pay Mrs. Moog in cash, not to give her stock in MCI or to otherwise involve her in MCI's business affairs (See Exhibit 16, p. 7). The proposed Chapter 11 plan represents a total reversal. Mr. Moog now wants to force Mrs. Moog's estate to accept stock in MCI with no assurance of any cash until the company is sold prior to or upon his death.

As acknowledged by Mr. Moog's counsel at closing argument, this is a "different deal", a deal he could have, but did not, propose in the divorce proceeding. Not only is this a different deal, it is a deal that comes on the heels of several months of state court litigation in which Mr. Moog drew substantial monies from MCI, lived a lavish lifestyle, retained full control of MCI, and induced the state court to withhold the appointment of a receiver. The state court was patient because Mr. Moog claimed he needed more time to implement the cash deal. Thus, not only did the bankruptcy filing delay Mrs. Moog's efforts to enforce her judgment, the delay came after several months of prior delay premised upon an intent completely at odds with the intended treatment of Mrs. Moog's claim in this Chapter 11 plan.

This case is a two-party dispute which can and should be resolved to its conclusion in the state court forum where it began. *See In re H.B.A. East*, 87 B.R. 248, 260 (Bankr.E.D.N.Y.1988) ("Chapter 11 was never intended to be used as a fist in a two-party bout. The Chapter is entitled reorga-

nization and not litigation."). Mr. Moog does not need Chapter 11 protection to conduct his business affairs and pay his other creditors. He is fully capable of paying all of his other debts. The undisputed unsecured claims, consisting largely of professional fees, total approximately $105,-000.00. As he admitted in his § 341 Meeting, no creditors other than his wife were pressing him for payment when he filed his petition. The larger secured claims arise from a loan for his yacht and a loan on his condo. These loans are being paid and can be paid without any need for restructuring under Chapter 11. The only significant unsecured claim, a $324,000 claim by a Mr. Mulnar, is an attempt to hold Mr. Moog's personally liable on a corporate debt. That claim is in litigation, litigation which Mr. Moog can afford to continue outside of bankruptcy. In short, Mr. Moog is fully able to pay all of his other debts without the need for a Chapter 11 reorganization. This conclusion is supported by the substantial money that Mr. Moog continues to draw from MCI, as well as the value of his other assets.

The only so called reorganization need in this case is the desire to "reorganize" the judgment obligation to Mrs. Moog. While all bankruptcy cases in which spouses seek to restructure divorce settlements or judgments are not necessarily subject to dismissal as bad faith filings, this case must and will be dismissed. Mr. Moog is not just seeking additional time to pay a money judgment. Instead, he is attempting to use the bankruptcy court to undo and totally restructure an agreement that he reached with Mrs. Moog in November, 1991, and which he continually agreed to pay in cash during the several months of state court hearings in which Mrs. Moog sought to enforce the judgment.

Mr. Moog argues that without the protection of and opportunity to reorganize in Chapter 11, he will be forced to sell MCI at an unfavorable price.[1] What is wrong, he asks, with wanting to keep the company to

---

1. Moog, Inc., has offered between $18 and $20 million for the company (Debtor's Exhibit WW). If sold for $18,000,000, Mr. Moog would only

get approximately $6,000,000 before taxes from the purchase price after paying the judgment to his wife's estate.

avoid that result? There are several things wrong with this concept. First, if MCI has declined in value since it was valued at $25,500,000 in the divorce settlement, some portion of that decline is attributable to Mr. Moog's own actions.

In September, 1991, Mr. Moog personally borrowed $1,000,000.00 from M & T Bank and caused MCI to guarantee his debt. When this bankruptcy case was filed, M & T made demand upon MCI which paid off the personal loan. As a result of this loan transaction, entered into after the divorce proceeding was commenced and after the date in which MCI was valued, MCI paid out $1,000,000.00 in cash for the benefit of Mr. Moog and to the detriment of the company.

In December, 1991, at Mr. Moog's direction, MCI declared a dividend eliminating a $331,000.00 debt that Mr. Moog owed to the company. In addition, as of January 1, 1992, Mr. Moog raised his salary from $460,000.00 a year to $2.4 million a year.[2] The evidence reflected losses in 1992 by MCI compared to substantial profits in earlier years. As a result, unlike in prior years, Mr. Moog's large salary in 1992 reduced the book value and possibly the actual value of MCI.

MCI's proof of claim in this case (Exhibit 40) reflects a substantial claim for reimbursement of personal expenses paid by MCI unrelated to MCI's business. In addition, MCI paid the expenses for Mr. Moog's plane which was used little, if at all, for MCI business purposes. Finally, in April, 1992, MCI paid, on Mr. Moog's behalf, the $500,000 he was ordered to pay towards Mrs. Moog's $8,500,000 judgment. In sum, after the agreed upon valuation date, under Mr. Moog's stewardship, MCI paid out to or for Mr. Moog, millions of dollars which did not benefit the company. As such, his actions were a contributing cause of any decline in MCI's value.

Moreover, whatever events caused MCI to fall in value, this decrease does not remove the bad faith taint of the bankruptcy filing or the proposed plan. If changed circumstances beyond the contemplation or control of the parties affect the fairness of the November 1991 divorce settlement, the court with jurisdiction over the divorce proceedings should hear Mr. Moog's equitable plea.

The prepetition and postpetition conduct of Mr. Moog which mandates dismissal of this case has some parallel to that of the debtor in *In re Khan*, 34 B.R. 574 (Bankr. W.D.Ky.1983). In that case, a surgeon filed a Chapter 11 petition to avoid payment of a $1,205,400.00 judgment in favor of a fellow physician rendered quadriplegic in an automobile accident caused by the debtor's negligence. The court noted the stark contrast between the victim's motorized wheelchair and Dr. Khan's Rolls Royce. As described by Bankruptcy Judge Deitz, "good faith in Chapter 11 presupposes some element of self-sacrifice by the debtor commensurate with that demanded by the creditors." 34 B.R. at 579.

The facts of this case do not chill the soul in quite the same way. Nevertheless, the arrogance and abuse found in that case are also present here. Mrs. Moog died in 1993, having received only a small percentage of the monies she was promised. Now, even after her death, Mr. Moog is intent on depriving her estate of payment until he dies or otherwise chooses, which is doubtful, to voluntarily sell MCI. In effect, two years after he agreed to a cash settlement, Mr. Moog now seeks to start over and force a new divorce settlement upon his now deceased wife. To allow this would be to twist and distort the concept of "fresh start".

### B. *Abstention*

■ Mrs. Moog argues alternatively for the Court to abstain from exercising jurisdiction over this case pursuant to § 305 of

---

**2.** Although this salary increase was emphasized by Mrs. Moog, Mr. Moog's total compensation was not increased substantially in 1992 since there was a corresponding reduction in the dividends he received. Mr. Moog had been receiving in excess of $2,000,000.00 a year in the years preceding the divorce as part of his overall compensation. *See* Debtor's Exhibits NNN, OOO, PPP, and QQQ.

the Bankruptcy Code. In support, she cites cases urging bankruptcy courts to avoid unnecessary incursions into domestic disputes. *See Carver v. Carver*, 954 F.2d 1573 (11th Cir.1992), cert. denied, *Carver v. Carver*, —— U.S. ——, 113 S.Ct. 496, 121 L.Ed.2d 434 (1992); *In re Boyd*, 31 B.R. 591 (D.Minn.1983); *Matter of Baker*, 75 B.R. 120 (Bankr.D.Del.1987).

In *Carver*, the Eleventh Circuit found that the bankruptcy court should have abstained from adjudicating whether the debtor's wife had violated the automatic stay by attempting to collect child support arrearages. As the court noted, "there is a danger that bankruptcy will be used as a weapon in an ongoing battle between former spouses over the issues of alimony and child support or as a shield to avoid family obligations." 954 F.2d at 1579.

*Carver* is distinguishable and does not compel abstention here. First, the *Carver* decision involved ongoing child support issues and its abstention discussion was in the context of alimony and child support. In this case, the parties' dispute was resolved by a property settlement, now reduced to judgment. Second, and more importantly, *Carver* involved abstention from just one contested matter in the pending bankruptcy case pursuant to 28 U.S.C. § 1334(c)(1).[3] In this case, movant requests abstention under § 305(a)(1) with respect to the entire case.

Section 305(a)(1) provides in pertinent part that "the court ... may dismiss a case ... at any time if the interest of creditors and the debtor would be better served by such dismissal or suspension." In analyzing the propriety of abstention under this section, the Court must give deference to the Debtor's interest as well as the interest of creditors. *See e.g., Matter of Condominium Association of Plaza Towers South, Inc.*, 43 B.R. 18 (Bankr.S.D.Fla.

1984). Here the debtor's interest would not be best served by abstention. The Court concludes that abstention is not an appropriate alternative in this case.

The fact that the dispute here is between former spouses and arises out of a state court dissolution judgment is of some relevance to the bad faith analysis. The Court finds that Chapter 11 petitions filed to alter the obligations of spouses must be viewed with greater scrutiny than petitions filed to restructure or reorganize other financial affairs of a debtor. Thus, while the Court rejects abstention as an alternative basis for relief, the Court does find that the principles of abstention discussed by the Eleventh Circuit in *Carver* provide additional support for dismissal under § 1112(b) where, as here, the debtor has filed bankruptcy to obtain an alternative forum for litigating a divorce settlement.

## CONCLUSION

Chapter 11 is not limited to destitute individuals. Moreover, not all Chapter 11 petitions filed primarily to resolve the claim of a single dominant creditor are subject to dismissal as bad faith filings. This wealthy individual, however, who filed a Chapter 11 petition in order to undo the dissolution judgment he agreed to, is not entitled to protection under Chapter 11 of the Bankruptcy Code. The motion to dismiss is granted.[4]

---

3. Section 1334(c)(1) provides: "Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

4. A written order dismissing the case was entered on September 20, 1993, following a hearing in which the Court's findings and conclusions were announced on the record. This Memorandum Opinion supersedes the orally announced findings and conclusions.