**In re HBA EAST, INC., Round One Productions, Inc., Jeffrey D. Levine, Debtors.**

**Bankruptcy No. 187–70557–353.**

United States Bankruptcy Court, E.D. New York.

June 3, 1988.

Arthur Steinberg, John P. Sirico, Kaye, Scholer, Fierman, Hays & Handler, Norman Klasfeld, Beal, Klasfeld, Lentz & Romash, New York City, for debtors.

Brian M. Cogan, Elaine Nussbaum, Stroock & Stroock & Lavan, New York City, H. Dixon Montague, Vinson & Elkins, Houston, Tex., for movants.

JEROME FELLER, Bankruptcy Judge.

We are confronted with another instance, recently occurring with increasing frequency in the bankruptcy courts, in which the right to seek relief under Chapter 11 of the Bankruptcy Code is challenged on the grounds that the reorganization petition was not filed in good faith. Specifically, before the Court for determination is a motion filed on July 6, 1987 by JEA Boxing Company, Inc. ("JEA") and Pine Hill Investments, Inc. d/b/a Houston Boxing Association ("Pine Hill") (collectively "Movants") to dismiss the Debtors' Chapter 11 petitions, for cause, pursuant to 11 U.S.C. § 1112(b), or to lift the automatic stay, for cause, pursuant to 11 U.S.C. § 362(d) based upon the Debtors' lack of good faith in filing their petitions. Alternatively, Movants request abstention pursuant to 28

U.S.C. § 1334(c) from considering the parties' state law claims in Adversary Proceeding No. 187–0086 (*JEA Boxing Company, Inc. et al., v. HBA East, Inc., et al.*) so as to permit adjudication of those claims in a pending pre-petition Texas state court lawsuit instituted by Movants.

The Debtors vigorously oppose the motion. Affidavits in support of the motion and in opposition thereto were filed. Pre-hearing memoranda of law were filed by both sides and evidentiary hearings were held on July 30, 1987, September 21, 1987 and October 13, 1987. Much testimony was adduced, numerous exhibits introduced and considerable argument heard. Following receipt of post-hearing submissions, the Court held final argument on November 24, 1987 and reserved decision. We are informed that final settlement discussions between the parties terminated without success on May 14, 1988.

For the reasons hereinafter set forth, which constitute the Court's findings of fact and conclusions of law, the motion to dismiss the Debtors' Chapter 11 cases as not being filed in good faith is granted. After careful review of the totality of facts, all the circumstances surrounding the Chapter 11 filings and the applicable law, we can only conclude that these Chapter 11 cases were commenced for purposes inconsistent with the underlying spirit, intent and overall policy aims of the Chapter. As such, dismissal is mandated in order to protect the jurisdictional integrity of the bankruptcy court and to prevent misuse of the bankruptcy reorganization process. In light of the Court's granting of the dismissal motion, we need not address the alternative relief sought by Movants.

## FACTS

### I. *Background*

This bitter dispute involves a business relationship between two boxing industry entrepreneurs gone sour. In one corner stands Josephine Abercrombie ("Abercrombie"); in the other stands Jeffrey D. Levine ("Levine"). Both pugilists operated through a maze of corporate entities often hopelessly confused in the record of these proceedings. Parsed down to its bottom line essentials, Abercrombie and/or her entities were to supply the funds in an enterprise variously referred to in the record as a joint venture, association, partnership or limited partnership. Levine and/or his entities, on the other hand, were to operate and manage that enterprise. After approximately two years, the relationship ruptured in or about December 1986. Charges of fraud, deceit, misconduct and overreaching were hurled, one against another. Funding of Levine's boxing promotion operations were terminated in or about January 1987 and a major lawsuit was commenced on March 3, 1987, in a Texas state court against Levine and his corporations.

The Texas state court litigation was automatically stayed by virtue of 11 U.S.C. § 362(a) when, on March 27, 1987, Levine and two of his corporations, HBA East, Inc. ("East") and Round One Productions, Inc. ("Round One") (collectively "Debtors") each filed separate petitions for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York. Since that date, the Debtors have remained in the possession of their property and the operation of their business pursuant to 11 U.S.C. §§ 1107 and 1108.

East and Round One are New York corporations located in Garden City, New York. Exhibit A annexed to their Chapter 11 petitions describes their businesses as packaging and promoting boxing events and the individual careers of professional prize fighters. Levine is the sole shareholder and President of both East and Round One. Exhibit A annexed to Levine's Chapter 11 petition identifies Debtor–Levine as the sole operating officer of two corporations engaged in the business of promoting professional prize events, presumably referring to East and Round One.

The Debtors' antagonists, at least nominally, are JEA and Pine Hill. JEA and Pine Hill are two Abercrombie owned Texas corporations located in Houston, Texas and, like the Debtors, are engaged in the business of boxing promotion. Abercrombie is the sole shareholder and a director of

both corporations. She is also Chairman of the Board of JEA. As indicated, JEA and Pine Hill are the Movants herein and Plaintiffs in both the Texas state court litigation and Adversary Proceeding No. 187–0086 filed in this Court.

With this background in mind, we now present a detailed exposition of the facts pieced together, as simply as possible, from a voluminous record, marked by inconsistencies, outright contradictions, vagueness and vehement factual disputes between the parties. The disagreements are so pervasive that the parties even dispute their disagreements.

II. *The Genesis and Development of the Business Relationship Between Levine, Abercrombie and their Respective Corporations*

Levine entered the boxing promotion business in 1979. Prior to connecting with Abercrombie in or around October 1984, Levine, with the apparent assistance of his attorney, friend, advisor and landlord, Michael M. Perlman, Esq. ("Perlman")[1], formed a number of corporations to conduct his boxing ventures.[2] In 1980, Round One, was formed. In 1984, Levine formed Round One Promotions, Inc., Ring Sports Promotions, Inc. and Ring Network, Inc. Through the latter two entities, Levine attempted to develop and sell a "pay per view" boxing series to television. Ring Sports Promotions, Inc. was to handle the boxing cards and Ring Network, Inc. was to handle the relationships with the television and/or cable networks. This venture failed. The investors ceased providing funds which Levine believed necessary to make the "pay per view" series successful and by the fall of 1984 Levine's boxing business was tottering on the brink of financial collapse.[3]

Levine met Abercrombie in or about October 1984. In the ensuing two or three months there were a number of meetings, conferences or discussions between Levine, Perlman, Abercrombie and her coterie of advisors or consultants. On or about October 22, 1984, Levine obtained from Abercrombie a $75,000 loan. Receipt of the monies was acknowledged by Ring Sports Promotions, Inc. and Ring Network, Inc., the repayment of which was secured by a 51% interest in Round One, a Debtor herein (Movants' Exh. R). Apparently, Abercrombie grew disenchanted with the "pay per view" venture and declined to further provide monies for that operation. However, Levine and Abercrombie agreed to collaborate in the promotion of prize fighters and boxing events, thereby incepting an undefined and unstructured business relationship to be formalized in the future. This new relationship was referred to in a letter to Abercrombie, dated November 29, 1984, on the letterhead of Round One Promotions, Inc. (Movants' Exh. Q). On November 30, 1984, Abercrombie sent Levine a check in the sum of $40,000 (Movants' Exh. S).

The business arrangement between Levine and Abercrombie contemplated a mutually rewarding relationship whereby Abercrombie would supply the monies and Levine would provide the expertise and contacts for the promotion of boxing events. Levine deferred to Abercrombie in determining the precise form of their business relationship. Ultimately, it was decided that a limited partnership would be the appropriate structure to formalize the relationship.[4]

---

1. Perlman is the landlord of 585 Stewart Avenue, Garden City, New York, the location from which Levine and his corporations have throughout operated their businesses. Perlman conducts his affairs out of a suite, shared with Levine, at the same address.

2. The basis for placement by Levine of assets or transactions in particular corporations is entirely unclear in the record. *See, e.g.,* Testimony of Levine, Transcript of October 13, 1987 at pp. 79–80.

3. Subsequently, Levine, Ring Sports Promotions, Inc. and Ring Network, Inc. sued the investors for millions of dollars and the investors interposed substantial counterclaims. That action is apparently still pending in Supreme Court, Nassau County.

4. The limited partnership structure was selected by Abercrombie, based upon the advice of her lawyers and accountants, for purposes of liability and tax protection. Debtors' Exh. 1 at 42.

In December 1984, Perlman incorporated East, the principal Debtor herein, on behalf of Levine to serve as the corporate vehicle to implement Levine's business relationship with Abercrombie and/or her corporations. That linkage is reflected by the appellation chosen. The initials "HBA" in East's name derive from "Houston Boxing Association", Abercrombie's corporate entity otherwise known as Pine Hill. For some sixteen (16) months, Abercrombie's lawyers and accountants, drafted, redrafted and circulated countless variants of a limited partnership agreement in an attempt to memorialize the Levine and Abercrombie relationship. In May 1986, Levine signed a limited partnership agreement (Movants' Exh. T and U), which agreement was made effective as of January 31, 1985. The terms of this complex agreement essentially provide that East is to promote boxing events on behalf of a limited partnership between East and Pine Hill denominated as HBA East, Ltd ("Limited Partnership"). JEA was admitted into the limited partnership as a general partner by way of amendment to the limited partnership agreement. East is designated as a general and managing partner under the limited partnership agreement.

Levine contests vigorously the legality of the limited partnership agreement and the very existence of the Limited Partnership.[5] He asserts, among other things, that there never was a meeting of the minds on salient aspects of the limited partnership agreement and that such agreement, together with companion documents, were filed with the Texas Secretary of State in violation of a separate agreement to hold all the documents in escrow, pending resolution of outstanding issues. *See*, Debtors' Exh. Nos. 14 and 15.

East and the other Debtors received substantial funds from Abercrombie, Movants and/or other Abercrombie entities during the approximate two year period of the Levine-Abercrombie business relationship. Levine was utterly dependent upon these funds to conduct his boxing business (Testimony of Levine, Transcript of October 13, 1987 at pp. 107–108, 140). Movants assert that they provided funds to East and the other Debtors of at least $1.2 million, from which they have seen no repayment, return or accounting. Not surprisingly, the Debtors vigorously dispute the claim and apparently assert an array of defenses, offsets and counterclaims. *See*, Debtors' Proposed Findings of Fact and Conclusions of Law at p. 32.

III. *The Rupture and Ensuing State Court and Bankruptcy Court Litigation*

In or about December 1986, the business relationship between Levine and Abercrombie deteriorated beyond the point of repair. Although the underlying cause of the rift is disputed, it would appear that irreconcilable differences arose over whether East should relocate from Garden City to Manhattan, and more importantly, the management of the alleged Limited Partnership,[6] the use of monies provided by Movants[7] and the extent of Levine's control over business operations. As a result of these disputes, Movants terminated all funding to East in early 1987 and thereafter purport to have invoked § 7.05 of the limited partnership agreement (Movants' Exh. U at 16), which provides that in the event of breach by East, Movants have the right to convert the interest of East in the partnership from general partner to limited partner and oust East from any further partic-

---

**5.** Movants have also claimed the existence of some other form of partnership interest entity with the Debtors. This contention is vigorously disputed by Levine as well.

**6.** Abercrombie wished to add one Stanley Hoffman ("Hoffman"), a boxing manager, as an additional party to the business venture comprised of Movants and East. Hoffman is or was a friend and associate of Levine who ultimately switched allegiance and went to work for the Abercrombie forces.

**7.** The Debtor's contend that the record does not support any assertion that there was disagreement among the parties as to the use of monies provided to East. This Court believes that this disagreement is implicit in the entire record.

ipation in the management and control of the partnership.[8]

Movants also took other action. On March 3, 1987, Movants commenced an action against the Debtors and other Levine entities in a Texas state court ("Texas Action")[9], alleging Texas state law claims for declaratory and injunctive relief, a constructive trust and an accounting, as well as unspecified compensatory and consequential damages arising from the Debtors' alleged fraud, breach of contract, breach of fiduciary duty, and diversion of business opportunity in connection with the limited partnership agreement. In addition, Movants sought the appointment of a receiver.

In early March 1987, or about the time Movants commenced the Texas Action and purported to have invoked § 7.05 of the limited partnership agreement, Movants transmitted a series of letters to boxers or other third parties already assertedly bound by contract to the Debtors (Debtors' Exh. Nos. 2–8). These letters made reference to provisions of the limited partnership agreement, initiation of the Texas Action and the consequent impact of such matters on the Abercrombie–Levine business relationship.[10]

The Debtors filed their Chapter 11 petitions in this Court on March 27, 1987, shortly prior to expiration of the time to answer the complaint in the Texas Action. Among other things, Levine's affidavit accompanying the Chapter 11 petitions of East and Round One asserts that the Texas lawsuit is without merit and further that the Texas court lacked jurisdiction to adjudicate the controversy. However, by filing on March 27, 1987, the Debtors were able to invoke the automatic stay, thereby rendering it unnecessary to answer, respond, or otherwise appear in the Texas Action. Confronted by the stay of the Texas Action triggered by the Chapter 11 filings, Movants commenced an Adversary Proceeding in this Court on April 24, 1987 against the Debtors (No. 187–0086) alleging state law claims similar to those raised in the Texas Action, as well as a claim that the monies allegedly owed by Levine to Movants constitute a non-dischargeable debt under 11 U.S.C. § 523. Having thus effectively transferred the situs of the litigation, the Debtors filed an answer to the complaint in Adversary Proceeding 187–0086 on or about May 20, 1987, denying all material allegations contained in the complaint and containing several counterclaims seeking, among other things, unspecified sums in compensatory and consequential damages plus punitive damages in an amount "upwards of" $1 million. Movants have replied to the counterclaims.

On July 6, 1987, Movants filed the instant motion seeking dismissal of the Debtors' Chapter 11 cases.

---

**8.** Section 7.05 of the limited partnership agreement reads as follows:

"At any time, if the Managing Partner is in breach of its duties hereunder, JEABCO shall have the right, exercisable by written notice to that effect from JEABCO to the Managing Partner [East] and without any further action, to convert the interest of the Managing Partner in the Partnership from a general partner interest to a limited partner interest in the Partnership. Such conversion shall not change such Managing Partner's Percentage Interest, its rights under Article V hereof, or its liabilites in connection with the Partnership or this Agreement to the extent same had accrued prior to the date of such notice, but shall preclude the Managing Partner from any further participation in the management and control of the Partnership."

**9.** *JEA Boxing Company, Inc.* and *Pine Hill Investments, Inc. d/b/a Houston Boxing Association v. HBA East, Ltd.*, et al. (No. 87–10167, Dist.Ct. of Harris Cy., Tex., 157th Judicial District). The non-debtor Levine entities sued were Ring Network, Inc. and Ring Sports Promotions, Inc.

**10.** Levine contends that these letters were part of a concentrated effort by Abercrombie, through her agents, to interfere with or divert assets of East. Movants assert, in turn, that such assets belong to the alleged Limited Partnership or, at least, some other partnership entity with the Debtors, and that it was Levine who consistently usurped or diverted the boxing contracts from the partnership to East.

## IV. *Assets, Liabilities and Operations of Debtors* [11]

### A. East

1. *Assets*—East's Chapter 11 petition reflects assets as of March 24, 1987 aggregating $268,500, comprised of the following: cash—$5,000; accounts receivable—$40,000; furniture and equipment—$2,500; boxing contract rights—$200,000; video tapes of fight films—$5,000; a 1986 Lincoln Mark VII automobile—$16,000. The schedules executed by Levine on May 12, 1987 report East's assets in the sum of $376,000. The discrepancy is apparently attributable to inclusion in East's schedules of an intercompany debt owing from Round One in the amount of $148,000 and omission from East's schedules of the $40,000 accounts receivable item. Round One's schedules, also executed on May 12, 1987 by Levine, reflect the intercompany debt to East for monies borrowed in the amount of only $83,000. In any event, whatever the correct figure might be, the monies owing from Round One is a highly dubious asset in that Round One is a comatose entity with no assets other than a hotly disputed boxing contract with one fighter.[12]

East's only assets of any possible significance are the boxing contract rights, particularly its claimed rights to certain prize fighters—Tony Tucker, Vincent Borgese, Tony Martin, Roger Mayweather and Terry Marsh.[13] With the possible exception of Tony Tucker, East has never made money to speak of from the other fighters.[14] Moreover, and most importantly, all of East's contract rights may not even constitute assets of the Debtor at all. As indicated, Movants stoutly assert that such contracts belong to the Limited Partnership and that Movants ousted East/Levine from management and control over the Limited Partnership assets under the terms of the underlying limited partnership agreement.[15]

2. *Liabilities*—East's Chapter 11 petition reflects liabilities as of March 24, 1987 aggregating $378,000, comprised of the following: secured debt (auto loan)—$16,000; priority debt (taxes)—$75,000; general unsecured debt—$287,000. East lists twelve (12) general unsecured creditors. The bulk of the unsecured debt ($250,000—87%) is listed as disputed obligations to Movants, i.e., JEA—$125,000 and Pine Hill—$125,000.[16] There are two (2) other unsecured creditors with disputed claims totaling $22,400. The remaining eight (8) unsecured creditors hold East's only undisputed unsecured debt. The latter totals only $14,900 or approximately 5% of East's general unsecured debt. These obligations range from dues owing the Mid–American Boxing News and the International Hall of Fame in the sums of $35.00 and $25.00, respectively, to bills for unpaid accounting services in the amount of $6,500 to Joel J. Ratzker, C.P.A.

3. *Operations*—East is a one man business run by Levine. Apart from Levine, it employs one other person, a secretary. East was never a self sustaining operation prior to the filing of the petition. Absent

---

11. All figures in this section of the decision are rounded off.

12. For a description of this "asset" of Round One and the disputes related thereto, see discussion of Round One's assets, *infra*, at p. 255.

13. Terry Marsh has retired due to epilepsy. Testimony of Levine, Transcript of October 13, 1987 at p. 92.

14. Levine testified that East's most valuable asset is the Tucker promotional rights contract (September 21, 1987 Transcript at p. 151, October 13, 1987 Transcript at p. 123) and prior to August 1, 1987 East made a net profit of $75,000 on Tucker (October 13, 1987 Transcript at pp. 92–93).

15. Although not reflected on East's Chapter 11 petition or schedules, Levine testified that he, presumably referring to East, has an interest in certain fighters—Frank Tate, Choo Choo Dixon, David Garvin and Vincent Bulware—signed by Movants (Transcript of September 21, 1987 at pp. 173–174). Movants/Abercrombie surely dispute this assertion as energetically as East/Levine's claim to East's other contract rights. It would appear that East's only undisputed asset may well be Levine's boxing industry acumen, experience and contacts.

16. Levine did not know the basis upon which the $250,000 figure was selected. Testimony of Levine, Transcript of October 13, 1987 at pp. 83–86. As indicated, Movants claim to have advanced the Debtors at least $1.2 million.

the monies provided from Abercrombie sources, East could not have survived. Testimony of Levine, Transcript of October 13, 1987 at pp. 107–108, 140. Although certain boxing promotions were profitable, according to Levine, on the whole, East never made money from its inception to the time of its Chapter 11 filing, a period of approximately 2¼ years. Transcript of October 13, 1987 at p. 101.

Since the filing of its Chapter 11 petition, East's operations have been sustained primarily as a result of one boxing event it co-promoted involving Tony Tucker on August 1, 1987, a fight between Tucker and Mike Tyson.[17] Since Movants/Abercrombie dispute East/Levine's contract rights to Tucker, East's deposit of some $140,000 in its operating account from the Tucker fight was a result of a stipulation agreed to by the parties after a bitter battle and so ordered by the Court. In accordance with the stipulation, a sum of $175,000 from the fight was placed in escrow pending further order of the Court. Subsequently and predictably, a dispute arose as to the proper allocation of the monies from the Tucker fight as between East's debtor in possession operating account and the escrow account.[18]

### B. Round One

1. *Assets*—Round One's Chapter 11 petition reflects assets as of March 26, 1987 consisting of cash in the sum of $366.00 and contract rights valued at $50,000.[19] The $50,000 in contract rights comprises Round One's only asset and refers to an asserted exclusive promotional rights contract with Carl Williams ("Williams"), a ranking heavyweight contender. The schedules executed by Levine on May 12, 1987 value the Williams promotional contract at $225,000. In his testimony, Levine even went further in representing that Williams "was probably one of the two remaining opponents out there for Mr. Williams [i.e., Mike Tyson]" and that the right deal for a Williams–Tyson match would be worth $250,000—$750,000.[20] Transcript of September 21, 1987 at p. 148.

Most significantly, however, whatever the value of the Williams contract might be to Round One, such value may well be academic. The very existence of that contract dating back to March 7, 1984 is subject to a dispute between Round One and Williams in pending litigation before this Court (*Round One Productions, Inc. v. Carl Williams, Adversary Proceeding No. 187–0015*). Williams contends that the promotional rights contract has expired by its very terms long ago and he has filed a motion for summary judgment predicated upon the alleged expiration. Moreover, even assuming that the Williams contract is still in existence, Movants/Abercrombie assert substantial interests in that contract predicated upon, among other things, i) a 51% security interest in the assets of Round One arising out of the $75,000 loan in October 1984 to Ring Sports Promotions, Inc., Ring Network, Inc. and/or Levine (Movants' Exh. R, Testimony of Levine, Transcript of October 13, 1987 at pp. 45–

---

**17.** Tucker lost the August 1, 1987 fight with Tyson.

**18.** After the close of the record on the instant dismissal motion, East in or around November, 1987, acquired the promotional rights to Roberto Duran, a former boxing champion and a current ranking middle weight contender. In February, 1988, Duran beat Rick Stackhouse in a middle weight contest co-promoted by East/Levine. In light of the closing of the record on October 13, 1987, Movants/Abercrombie have not been heard in respect of the Roberto Duran contract rights. In any event, we would note that East's statement of operations for April, 1988 reflect year to date losses of $67,000 on a cash basis and $32,000 on a accrual basis. The balance in East's debtor in possession operating account as of April 30, 1988 was reported at $114.00. East also reported the sum of $4,400 in a debtor in possession money market account as of April 30, 1988.

**19.** The balance sheet also reflects an accounts receivable item of $8,000. However, this figure is neither included in the tally of total assets in that balance sheet or Exhibit A annexed to the petition. We can only conclude therefore that this item was either included erroneously or is valueless.

**20.** With all due respect to Williams' pugilistic abilities, it may be noted that over the recent few years Williams has lost bouts with top heavyweight fighters such as Larry Holmes, Mike Weaver and Bert Cooper.

47); and ii) advances of at least $65,000—$70,000 by Movants/Abercrombie specifically in connection with the promoting of Williams (Testimony of Levine, Transcript of October 13, 1987 at pp. 99–100).[21]

2. *Liabilities*—Round One's Chapter 11 petition reflects liabilities aggregating $257,500, all unsecured debt, of which $250,000 (97%) is listed as disputed obligations to Movants, i.e., JEA—$125,000 and Pine Hill—$125,000.[22] Round One lists only two (2) general unsecured creditors other than Movants in the sum of $7,500, one of whom may well be an insider. Round One lists a debt of $2,500 for unpaid accounting services to Joel J. Ratzker. Mr. Ratzker owns a 5% interest in Williams. Testimony of Levine, Transcript of October 13, 1987 at p. 90.

3. *Operations*—Round One is essentially a defunct, non-operating company employing one person, Levine himself. It has but one claimed asset, the hotly disputed Williams contract. As Levine so aptly stated, "it's [i.e., Round One] strictly the Carl Williams situation." Transcript of October 13, 1987 at p. 78. The last time Round One made a profit was February 1986 (Testimony of Levine, Transcript of October 13, 1987 at pp. 90–91). Round One's "statements of operations" since the filing of its Chapter 11 petition reflect little more than *de minimis* interest income amounting to approximately $1,000.

### C. Levine

First and foremost to any meaningful consideration of Levine's Chapter 11 filing, the inextricable relationship and virtual identity between Levine and his two corporations, East and Round One, must be recognized. Levine's filing, like the filings of East and Round One, was precipitated by his disputes with Abercrombie. Indeed, Levine's affidavit accompanying his Chap-

ter 11 petition sets forth only the Texas action as the reason for the filing. Assertions by Levine regarding difficulties in meeting certain day to day personal obligations such as the monthly mortgage payments on his home[23] strain credulity, particularly in light of his payments of substantial retainers ($45,000) to the two law firms retained to prosecute the three (3) Chapter 11 cases.

Levine's Chapter 11 petition reflects assets and liabilities of $161,000 and $294,000, respectively. Levine's only reported asset of value ($160,000) is a one-half interest in his jointly owned home in Dix Hills, New York. The value of his ownership of East and Round One, identified in his schedules as "corporations in companion Chapter 11 proceeding [sic], corporations presently insolvent" is reflected as "unknown". Apart from an accelerated one-half principal amount of mortgage debt on his home ($80,000) and some estimated and disputed tax obligations ($37,000), Levine's Chapter 11 petition reflects liabilities to eighteen (18) general unsecured creditors, each in sums of less than five-hundred dollars ($500.00). The total of these eighteen (18) general unsecured claims is only $3,030. Included therein are disputed debts to Movants of $2.00, i.e., JEA—$1.00 and Pine Hill—$1.00.[24] Levine's four (4) remaining general unsecured claims arise out of a dental bill (approximately $1,250), a medical bill ($1,855), a loan from his accountant, Joel J. Ratzker ($70,000), and a loan from one Jeffrey Schwartz ($100,000). No evidence was adduced regarding the terms, conditions and circumstances underlying these loans. Further, regarding the loan from Jeffrey Schwartz, no evidence was adduced regarding his relationships or connections to Levine.

21. In addition, Movants contend that ownership of the Williams contract is in the Limited Partnership and not Round One. (Testimony of Robert F. Spagnola, Transcript of September 21, 1987 at pp. 50–51).

22. The basis for the listed $250,000 disputed debt to Movants was never explained. See, footnote 16, *supra.*

23. Levine testified that he was "about three or four months" in arrears on the home mortgage. September 21, 1987 Transcript at p. 171.

24. See, footnotes 16 and 22, *supra.*

## V. *The Camacho Affair*

Prior to Levine's connection with Abercrombie he had promoted certain boxing contests for a fighter named Hector "Macho" Camacho ("Camacho") through Round One Promotions, Inc. Camacho left Levine to use other promoter services and efforts were made by Levine to attract him back to his fold. In late February 1987, when the dispute between Levine and Abercrombie was reaching its high point, Camacho was training at Abercrombie's facilities in Houston, Texas with Pine Hill picking up the expenses. Presumably, Camacho's presence in Houston was attributable to the business relationship between Movants/Abercrombie and the Debtors which was then in the process of evisceration.

Abruptly, for reasons that are sharply disputed by the parties, on or about February 26, 1987, Camacho packed his bags and left Houston. Shortly after the departure, Camacho was signed up for a bout with Howard Davis in Atlantic City, New Jersey on May 2, 1987 by a newly formed corporation, Ring Warriors, Inc. ("Ring Warriors"). Ring Warriors was formed on March 17, 1987, two weeks after the Texas Action was commenced by Movants and ten (10) days prior to the filing of the Debtors' Chapter 11 petitions. This new entity was incorporated by Perlman, Levine's close friend and the Debtors' pre-petition attorney, through the filing of a certificate of incorporation identical to the one earlier used by Perlman to incorporate East. Ring Warriors' start up capital consisted of $10.00 contributed by Perlman, who is the corporation's sole officer, director and shareholder. Levine is variously described as a "principal employee" or "sales agent" of Ring Warriors. Ring Warriors realized approximately $300,000 in gross revenues for the promotion of the May 2, 1987 Camacho–Davis bout and Levine received $10,000, which sum is variously described as a "commission" or "referral fee".

Movants cite the Camacho saga as a blatant manifestation of Levine's seizure of Limited Partnership business opportunities and/or misuse of the Chapter 11 process by way of diversion of estate assets. Underlying this assertion is the alleged existence of a promotional rights contract entered into between Camacho and East. Levine disputes the existence of such a contract, asserting that East merely had a form of letter from Camacho allowing Levine to explore with the networks and other promotors the availability of boxing contests for Camacho. Significantly, the document referred to by the parties to buttress their respective positions vanished and was never produced. Furthermore, this Court attaches little credibility to the self-interested testimony of the parties regarding such vanished document.

Levine contends that Ring Warriors was formed because Camacho refused further direct or indirect involvement with Abercrombie or her companies because of alleged personally disparaging remarks made to him by representatives of Movants and threats of litigation against him made by Movants if he went to work for the Debtors. Thus, according to Levine, Camacho was "steered" to Ring Warriors, an entity divorced from the warring factions. Movants, of course, vigorously dispute these assertions as a matter of fact and as credible reasons for the formation of Ring Warriors and that company's promotion of the Camacho–Davis fight. Significantly, neither party called Camacho as a witness to shed light on the situation and the reasons for his signing a contract with Ring Warriors remain a mystery.

We are unable to make any ultimate findings or determinations vis a vis the Camacho dispute on this record. The evidence in that regard is incomplete and in hopeless conflict. Happily, resolution of the instant motion to dismiss the Debtors' Chapter 11 petitions does not hinge on its divination. The Camacho dispute does have, however, ancillary significance to the dismissal motion in that the charge of diversion of assets so graphically portrays the intensity and depth of the two party dispute between Abercrombie and Levine. In that connection, it should be pointed out that the Debtors, in turn, counter punch in charging that Movants/Abercrombie have diverted their assets and/or seized their business opportunities through, among oth-

er things, the formation by Abercrombie of a new entity, HBA, Inc., in April 1987.[25]

## DISCUSSION

Every bankruptcy reorganization provision since 1898 has incorporated expressly, or by judicial interpretation, a good faith standard for the commencement, maintenance and confirmation of bankruptcy rehabilitation cases. *In re Victory Construction Co., Inc.* 9 B.R. 549, 551–558, 565–569 (containing detailed and excellent historical survey), *modified on other grounds,* 9 B.R. 570 (Bankr.C.D.Cal.1981), *vacated as moot,* 37 B.R. 222 (B.A.P. 9th Cir.1984). Although good faith is required for confirmation of a reorganization plan, 11 U.S.C. § 1129(a)(3), Chapter 11 does not expressly condition the right to file or maintain a Chapter 11 case on good faith of the debtor at the time the case is initiated. However, 11 U.S.C. § 1112(b) permits a bankruptcy court to dismiss a Chapter 11 case "for cause". The provision lists ten (10) examples of cause, but the list is not exhaustive.[26] In that connection, the pertinent legislative history points out that the court is empowered to consider other factors to reach appropriate results in particular cases. H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), S.Rep. 989, 95th Cong., 2nd Sess., 117 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5903, 5963, 6365. The precise perimeters of "cause" are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a Chapter 11 case for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reor-

ganization process. Thus, inherent in the statute and clearly inferred in 11 U.S.C. § 1112(b) is the requirement of good faith on the part of a debtor to file and maintain a Chapter 11 case. This implicit good faith Chapter 11 prerequisite has been consistently upheld by the courts. *See, e.g., Natural Land Corporation v. Baker Farms, Inc. (In re Natural Land Corporation),* 825 F.2d 296 (11th Cir.1987); *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.),* 779 F.2d 1068 (5th Cir.1986); *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985); *Albany Partners, Ltd. v. W.P. Westbrook, Jr. (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir.1984); *Furness v. Lilienfield,* 35 B.R. 1006 (D.Md. 1983); *In re Victory Construction Co., Inc., supra; In re 299–Jack Hemp Associates,* 20 B.R. 412, 413 (Bankr.S.D.N.Y.1982) (Bankruptcy court in construing § 1112(b) "follows by what is now impressive judicial gloss that an indispensable ingredient of every [Chapter 11] petition filed ... is that it be in good faith").

The good faith requirement provides parties in interest and the bankruptcy courts with an important and useful policing tool for preserving the reorganization process for those Chapter 11 cases for which it was actually intended. Its proper application makes certain that debtors who seek bankruptcy reorganization protection do so for no purpose other than to accomplish the legitimate aims and objectives of the statute. The Congressional design in enacting Chapter 11, like its predecessor reorganization provisions under the former Bankruptcy Act, was to encourage resort to bankruptcy reorganization as a means of avoiding premature or unnecessary liqui-

---

**25.** We thus have a total of no less than four (4) "HBA" entities in these proceedings—i) HBA East Inc., the principal Debtor herein; ii) Pine Hill Investments, Inc. d/b/a Houston Boxing Association, one of the Movants herein, iii) HBA East Ltd., the alleged Limited Partnership; and now iv) HBA Inc., a new Abercrombie entity. This phenomenon—along with the virtual identity between Levine and his companies, Abercrombie and her companies, plus the poor or non-existent bookkeeping practices of the parties—was responsible for the tendency of the parties, and per force this Court, to be imprecise in their references to the various entities

throughout the instant dismissal motion proceedings.

**26.** 11 U.S.C. § 1112(b) reads, in relevant part, as follows: "[O]n request of a party in interest ... the court may dismiss a case under this chapter ... for cause, *including* ...." [Emphasis Added]. The list of ten (10) enumerated causes for dismissal are set forth immediately thereafter. The phrase "including" is specifically recognized by the statute as a term which is "not limiting". 11 U.S.C. § 102(3) (rule of construction).

dations—thereby maximizing payments to creditors, saving jobs and, if possible, preserving shareholder interests. Congress clearly described that goal as follows:

"The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they are designed are more valuable than those assets sold for scrap. Often, the return on assets that a business can produce is inadequate to compensate those who have invested in the business. Cash flow problems may develop, and require creditors of the business, both trade creditors and long term lenders, to wait for payment of their claims. If the business can extend or reduce its debts, it often can be returned to a viable state. It is more economically sufficient to reorganize than to liquidate, because it preserves jobs and assets.

. . . .

The purpose of the reorganization ... case is to formulate and have confirmed a plan of reorganization ... for the debtor. The plan determines how much creditors will be paid, and in what form (cash, property or securities, for example); whether the stockholders will continue to retain any interest in the company; and in what form the business will continue...."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 220–21 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5963, 6174, 6180. The key phrases in this explanation of the Chapter 11 purpose are "restructure a business's finances" and "business reorganization".

■ No single factor is determinative of the issue of good faith, but rather the bankruptcy courts must examine the facts and circumstances of each case in light of several established guidelines or indicia. As the Fifth Circuit observed in *In re Little Creek Development Company, supra,* 779 F.2d at 1072:

"Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives.... Findings of lack of good faith in proceedings based on ... [Section] 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum."

These guidelines, insofar as here applicable, require consideration of the following: i) whether the Debtors filed their Chapter 11 petitions as a tactic to obtain a litigation advantage, ii) whether the Debtors' reorganization effort is essentially a two party dispute, iii) the nature and extent of the Debtors' assets, debts and business operations and iv) whether there is a reasonable probability that a reorganization plan can be proposed and confirmed.

■ The filing of the Debtors' Chapter 11 petitions on March 27, 1987 was strategically timed and calibrated to events in Texas. A period of approximately three months had elapsed since the complete breakdown of the Abercrombie–Levine business relationship and concomitant termination of funding the Debtors' operations. Movants had taken concrete steps to cure or mitigate their alleged hurt arising out of that relationship, the most significant of which was commencement of the Texas Action on March 3, 1987. By filing on the eve of their answering date in the Texas Action and not before, the Debtors were able to use the automatic stay as a sword to avoid appearing in that lawsuit, and were able to shift the forum of their disputes with Movants to this Court, a forum they believed might be more favorable to their plight.[27] As a general rule where,

---

27. Levine asserts that the Texas Action was too expensive to defend and that he obtained an estimate that it would cost approximately $30,000 in legal fees just to litigate the jurisdiction of the Texas court. Interestingly, the Debtors paid $45,000 in retainers to their lawyers in connection with their Chapter 11 cases and have incurred further substantial Chapter 11 legal

as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith. *Furness v. Lilienfield, supra; In re Karum Group, Inc.,* 66 B.R. 436 (Bankr.W.D.Wash.1986); *In re Smith,* 58 B.R. 448 (Bankr.W.D.Ky.1986); *In the Matter of Jesus Loves You, Inc.,* 46 B.R. 37 (Bankr.M.D.Fla.1984); *In re Wally Findlay Galleries (New York), Inc.,* 36 B.R. 849 (Bankr.S.D.N.Y.1984).

▇ The Debtors do not deny that their Chapter 11 petitions were filed as a litigation tactic. Instead, the Debtors argue that Chapter 11 filings may be dismissed only in situations where the litigation tactic rises to the level of being "abusive", such as where either i) a trial date was imminent in a non-bankruptcy forum and a debtor sought to avoid the day of reckoning by filing a Chapter 11 petition; or ii) a debtor sought to avoid an order of a non-bankruptcy forum by filing a Chapter 11 petition. Since no trial was imminent in the Texas Action and the state court in that lawsuit had not issued any orders, the argument is made that there is no basis to dismiss the Debtors' Chapter 11 petitions as a litigation tactic. This argument has no merit. The Debtors make a distinction without a difference and would have this Court draw an impossible distinction between a permissible litigation tactic and an impermissible one. This Court will not embark upon such futile efforts. Chapter 11 petitions filed for the purpose of frustrating the legitimate processes of a non-bankruptcy forum constitute use of the reorganization vehicle inconsistent with the congressional intent. *In re Martin,* 51 B.R. 490, 495 (Bankr.M.D. Fla.1985). Chapter 11 relief should not be available to entities filing to obtain a perceived advantage in litigation with others or to provide an alternate judicial forum. *Northwest Place, Ltd. v. Lawrence E. Cooper (In re Northwest Place, Ltd.),* 73 B.R. 978, 982 (Bankr.N.D.Ga.1987). As one court succinctly put it, "[t]he automatic stay was not intended to grant defendants

and accounting expenses without any progress

a last-minute escape chute out of pending civil litigation." *Furness v. Lilienfield, supra.,* 35 B.R. at 1009.

It is abundantly clear that but for the disputes between Debtors/Levine and Movants/Abercrombie and commencement of the Texas Action no Chapter 11 cases would have been filed by the Debtors. In essence, these Chapter 11 cases involve little more than a private two-party dispute. Other than the disputed claims of Movants, the Debtors' debts were surely not so significant or pressing to require resort to Chapter 11. Indeed, no evidence was adduced by the Debtors showing that their relatively few other creditors, most of whom hold *de minimis* claims, were pressuring for payment. The Debtors' problems are intrinsically interwoven with their disputes with Movants and cannot be cured absent their favorable resolution. The Chapter 11 petitions were filed for that purpose.

An important factor to consider in determining whether a Chapter 11 case was initiated in good faith is whether the reorganization effort essentially involves a two-party dispute which can be resolved in a non-bankruptcy forum. *In re Van Owen Car Wash, Inc.,* 82 B.R. 671, 673 (Bankr.D. N.H.1988); *In re Heritage Wood 'N' Lakes Estates, Inc.,* 73 B.R. 511, 514 (Bankr.M.D. Fla.1987); *In re Cooper Properties Liquidating Trust, Inc.,* 61 B.R. 531, 536 (Bankr.W.D.Tenn.1986); *In re Wellwood Corp.,* 60 B.R. 319, 320–21 (Bankr.M.D.Fla. 1986); *In re Martin, supra,* 51 B.R. at 495; *In re American Property Corporation,* 44 B.R. 180, 182 (Bankr.M.D.Fla.1984); *In re Mildevco,* 40 B.R. 191, 192 and 194 (Bankr. S.D.Fla.1984). These Chapter 11 cases do not represent efforts pitched to a "business reorganization" or to "restructure a business's finances". They are essentially a two-party civil lawsuit involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11. Chapter 11 was never intended to be used as a fist in a two party bout. The Chapter is entitled reorganization and not litigation.

towards resolving their disputes with Movants.

Other factors developed by the cases evidencing an absence of good faith in the filing and maintenance of Chapter 11 cases must also be considered. Reorganization presupposes the existence of monies to pay the expenses of operating a business and assets to generate the funds for implementation of a reorganization plan. These Debtors had minimal cash when they filed ($5,366.01) [28] and report even less ($2,059.62) in their debtor-in-possession operating accounts as of the most recent date available, i.e., April 30, 1988. [29] The Debtors' only assets of any possible significance are the boxing promotional contracts. Not only are these assets highly speculative, but even more importantly their ownership and control are vigorously disputed by Movants. Indeed, the asset claimed to be the most valuable, the Williams contract, is attacked from two fronts—Movants laying claim to the contract and Williams himself asserting that the contract has expired by its very terms. The existence of disputes or contingencies relating to a debtor's only possible significant assets constitutes basis for dismissal of a Chapter 11 petition as not being filed in good faith. *See, In re Winshall Settlor's Trust, supra,* 758 F.2d at 1137.

■ The Debtors' boxing business has never been a self sufficient operation. Levine's utter dependence upon funding from Abercrombie sources is an undeniable fact and even with the substantial funds emanating from Abercrombie sources the Debtors, according to Levine, have never operated profitably over a sustained period of time. Levine's pre-Abercrombie boxing ventures were similarly unsuccessful, resulting in major litigation upon the refusal of other persons to provide further funding. The history of the Debtors, disputes regarding the ownership and control of their assets, and the absence of funding from outside sources support the conclusion that these Debtors have no realistic chance of successfully reorganizing. The

absence of a realistic probability of successful reorganization is grounds for dismissal of a Chapter 11 petition as not being filed in good faith. *Albany Partners, Ltd., v. W.P. Westbrook, Jr. (In re Albany Partners, Ltd.), supra,* 740 F.2d at 674; *In re Winshall Settlor's Trust, supra,* 758 F.2d at 1137 (Whether there is a probability of a plan of reorganization being proposed and confirmed is a factor to be considered in determining whether a Chapter 11 petition was filed in good faith). Neither the bankruptcy courts nor creditors should be subject to the costs and delays of reorganization proceedings where there is little more than visionary hopes of rehabilitation.

The Debtors insist that because Chapter 11 of the Bankruptcy Code contains no express requirement for the filing of reorganization petitions, if a debtor is motivated by plausible, legitimate reorganization purposes and not by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a Chapter 11 case. As authority for this proposition, the Debtors cite *In re Clinton Centrifuge, Inc.,* 72 B.R. 900 (Bankr.E.D.Pa.1987), *appeal pending,* and *In re The Bible Speaks, Inc.,* 65 B.R. 415 (Bankr.D.Mass.1986). The Debtors further remind the Court that entities should be accorded the opportunity to reorganize under the Bankruptcy Code's policy of "open access" to the reorganization process. *In re Johns–Manville Corp.,* 36 B.R. 727, 735–37 (Bankr.S.D.N.Y.1984), *appeal dismissed,* 39 B.R. 234 and 998 (D.S.D.N.Y.), *mandamus petition denied sub. nom. In re Committee of Asbestos–Related Litigants,* 749 F.2d 3 (2d Cir.1984).

■ The short answer to the Debtors' contentions is that every petitioner for reorganization purports to possess "plausible, legitimate reorganization purposes". The bankruptcy court, however, must examine all of the circumstances surrounding the filing of the petition in determining the issue of good faith, for the standard is an objective one rather than a question of the

---

**28.** The Debtors' Chapter 11 petitions reflect cash as follows: East—$5,000, Round One—$366.01, Levine—0.

**29.** Cash balances in the operating accounts were reported as follows: East—$114.22, Round One—$1,945.40. Levine has not filed his monthly operating report for April, 1988.

subjective intention of the petitioners. Appellate courts and countless lower courts have labored hard to eliminate subjectivity in resolving issues of good faith in the filing and maintaining of Chapter 11 cases by establishing objective guidelines. Mindful of the fact that in the end good faith determinations are "subject to judicial discretion under the circumstances of each case", *In re Nancant, Inc.*, 8 B.R. 1005, 1006 (Bankr.D.Mass.1981), we are reluctant to commence argument with the *Clinton Centrifuge* and *Bible Speaks* cases. However, to the extent that *Clinton Centrifuge* and *Bible Speaks* may be construed to give undue reliance on the subjective intent of Chapter 11 petitioners and mere lip service to the good faith requirement, this Court respectfully disagrees with those decisions.

■ We do agree with the Debtors that Congress in the enactment of Chapter 11 did legislate a policy of "open access" to the reorganization process. This hardly means, as the Debtors would suggest, unbridled entitlement to that process. These Debtors filed their Chapter 11 petitions as a litigation tactic. The ensuing Chapter 11 cases involve little more than a two party conflagration, i.e., an effort to "reorganize" the disagreements with Movants. There are hardly any other creditors apart from Movants and there is no evidence that even such other creditors are clamoring for payment. The Debtors' one man business operation is highly speculative and the assets are disputed. There is virtually no money to run the business, no cognizable assets to fund a plan of reorganization and no realistic probability of a successful reorganization. Where, as here, the totality of facts and circumstances rise to a level of egregiousness compelling a conclusion that the reorganization process is being perverted, we are constrained to dismiss the Chapter 11 petitions as not being filed and maintained in good faith.

■ The Debtors further argue that they properly filed their Chapter 11 petitions to obtain the much needed protection of a breathing spell provided by the automatic stay contained in 11 U.S.C. § 362(a) as against Movants. This argument is fallacious. The protection of the automatic stay is not *per se* a valid justification for a Chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing. A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one. *In re Herndon Executive Center, Inc.*, 36 B.R. 803, 806 (Bankr.M.D.Fla.1984). Similarly, it has been held that Chapter 11 petitions filed merely to take advantage of other singular provisions of the Bankruptcy Code are improper and may be dismissed as not being filed in good faith. *In re Southern California Sound Systems, Inc.*, 69 B.R. 893 (Bankr.C.D.Cal.1987) (Chapter 11 petition filed to reject executory contract pursuant to 11 U.S.C. § 365(a)); *Northwest Place, Ltd. v. Cooper (In re Northwest Place, Ltd.) supra*, 73 B.R. 978 (Chapter 11 petition filed to invoke trustee's avoidance powers under Bankruptcy Code); *In re Cardi Ventures, Inc.*, 59 B.R. 18 (Bankr.S.D.N.Y.1985) (Chapter 11 petition filed to assume and assign lease pursuant to 11 U.S.C. § 365(f)); *In re Nancant, Inc., supra*, 8 B.R. 1005 (Chapter 11 petition filed to have certain tax liability determined pursuant to 11 U.S.C. § 505).

■ Finally, Debtors assert that Movants lack standing to bring their motion to dismiss the Chapter 11 petitions because it would appear that the funds loaned, transferred or advanced to the Debtors were made in large measure by Abercrombie and not the Movants. This contention is obviously without merit. Movants were scheduled as creditors by the Debtors themselves, albeit disputed ones. It is clear that by virtue of 11 U.S.C. § 101(9)(A) the term "creditor" is defined to mean an "entity that has a claim against the debtor that arose ... before the order for relief concerning the debtor". In turn, the term "claim" is defined in 11 U.S.C. § 101(4)(A) to mean a "right to payment, whether or not such right is ... disputed". Accordingly, Movants are creditors and have standing to raise the issue of bad faith. 11 U.S.C. § 1109(b) ("A party in interest, including ... a creditor ... may

raise and may appear and be heard on any issue in a case under this chapter").[30]

## CONCLUSION

Chapter 11 on its face does not discourage petitioners from trying to take advantage of the bankruptcy system. However, there is nothing in the legislative history which would indicate that Congress by omitting an express requirement of good faith intended to do away with this long established safeguard against misuse and abuse of bankruptcy reorganizations. Good faith is the gatekeeper of the equity court. Bankruptcy courts are equity courts with powerful tools at their disposal to interfere with or disrupt traditional laws. Were there no good faith limits on the invocation of these powers, they could easily cause injustice and thwart useful social policy. This can occur in several ways. Bad faith filings protect unworthy "debtors" and correspondingly inflict harm on their creditors or adversaries. Bad faith cases crowd out legitimate reorganization cases by the disproportionate amount of judicial attention that must be devoted to them. The successful maintenance of bad faith reorganizations brings disrepute on the bankruptcy system in the eyes of the public and in the long run drives up the cost of credit. The frequency of dubious Chapter 11 filings throughout the country accentuates a need for scrutiny and vigilance to prevent misuse of bankruptcy reorganizations and to protect the jurisdictional integrity of the bankruptcy court.

## ORDER

Based on all the foregoing, it is ORDERED, ADJUDGED AND DECREED that the motion to dismiss the above-captioned Chapter 11 cases filed by JEA Boxing Company, Inc. and Pine Hill Investments, Inc. d/b/a Houston Boxing Association be, and hereby is, granted; and it is further

ORDERED, ADJUDGED AND DECREED that the Chapter 11 cases of HBA East, Inc., Round One Productions, Inc.

and Jeffrey D. Levine be, and the same hereby are, dismissed.

---

**30.** In any event, the bankruptcy court has the power to raise the issue of good faith, *sua* *sponte,* to prevent misuse of its jurisdiction and miscarriage of its processes. 11 U.S.C. § 105(a).